USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-1807 P. GIOIOSO & SONS, INC., Petitioner, v. OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION AND CYNTHIA A. METZLER, ACTING SECRETARY OF LABOR, Respondents. _________________________ PETITION FOR REVIEW OF AN ORDER OF THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION _________________________ Before Selya, Circuit Judge, _____________ Coffin and Bownes, Senior Circuit Judges. _____________________ _________________________ Richard D. Wayne, with whom Lisa Schneider and Hinckley, _________________ ______________ _________ Allen & Snyder were on brief, for petitioner. ______________ Barbara A.W. McConnell, with whom J. Davitt McAteer, Acting ______________________ _________________ Solicitor of Labor, Joseph M. Woodward, Associate Solicitor, and ___________________ Ann Rosenthal, Counsel for Appellate Litigation, were on brief, _____________ for respondents. _________________________ June 13, 1997 ________________________ SELYA, Circuit Judge. The petitioner, P. Gioioso & SELYA, Circuit Judge. _____________ Sons, Inc. (Gioioso), seeks review of a final order of the Occupational Safety and Health Review Commission (the Commission) determining that it violated the Occupational Safety and Health Act of 1970 (OSH Act), 19 U.S.C. 651-678 (1994). The petition purports to raise six distinct objections to the Commission's order. The Secretary of Labor (the Secretary) maintains that we lack jurisdiction to hear three of these objections because Gioioso failed to raise them when it petitioned the Commission for review of the hearing examiner's adverse decision. The remaining objections, the Secretary tells us, are without force. The jurisdictional question is new to this court. We resolve it favorably to the Secretary and dispose of certain objections on that ground. We deny the remnants of the petition on the merits. I. THE STATUTORY SCHEME I. THE STATUTORY SCHEME Congress enacted the OSH Act "to assure so far as possible . . . safe and healthful working conditions." 29 U.S.C. 651(b). The Act spins an intricate administrative web which, among other things, separates rulemaking, enforcement, and adjudication. See Martin v. OSHRC, 499 U.S. 144, 151 (1991). In ___ ______ _____ general, the Secretary sets mandatory safety and health standards applicable to particular businesses. See 29 U.S.C. 651(b)(3). ___ The Occupational Safety and Health Administration (OSHA) enforces those standards. See id. 658-659, 666. Citations issued in ___ ___ respect to alleged violations are adjudicated by the Commission. 2 See id. 659, 661. ___ ___ The Commission operates in the first instance through administrative law judges (ALJs), who function as hearing officers. See id. 661(j). After hearing a contested matter, ___ ___ the ALJ prepares a report. See 29 C.F.R. 2200.90(a) (1996). A ___ member of the Commission may direct review of a report on his own motion (as long as he does so within 30 days after the docketing date, see id. 2200.92(b)), or on application of an aggrieved ___ ___ party. See id. 2200.91(a). The instrument by which an ___ ___ aggrieved party solicits the Commission's attention is called a petition for discretionary review (PDR), and the party must file it within a prescribed 20-day period following the docketing date. See id. 2200.91(b). The ALJ's report becomes the final ___ ___ order of the Commission unless review is granted "on or before the thirtieth day following the [docketing] date." Id.  ___ 2200.90(d). In other words, the Commission's failure to act on a PDR within the stipulated 30-day period is tantamount to a denial of review. Regardless of whether a final order comes about through action or inaction on the Commission's part, an aggrieved party may seek judicial review of it in the appropriate court of appeals. See 29 U.S.C. 660(a). ___ II. THE ORIGINS OF THE DISPUTE II. THE ORIGINS OF THE DISPUTE Gioioso is in the construction industry, specializing in utilities. Some time ago, it contracted with the Massachusetts Water Resources Authority (MWRA) to lay water lines 3 in Winthrop, Massachusetts. During a lengthy period beginning in 1993, it laid several thousand feet of pipe under or near the access road to MWRA's Deer Island work site. In the course of its endeavors, Gioioso dug an 18-foot- long trench at the intersection of Shirley and Taft Avenues. On October 6, 1994, Gioioso's foreman, Salvatore Santone, and a laborer, Fernando Camara, were standing in this trench. At that moment, several OSHA compliance officers happened to pass by the work site.1 The meandering traffic afforded the compliance officers a clear view of the trench and one of their number, Edward Wells, did not like what he saw: the trench's walls were unsloped and unsupported, the two workmen standing in the trench were visible only from the shoulders up, and a ten-foot section of cast metal pipe was suspended aloft from the bucket of a piece of heavy construction equipment located at one end of the trench. Wells sounded the alarm (figuratively speaking) and the driver stopped the car. One of Wells' colleagues, Patrick Griffin, exited the vehicle and hurried toward the trench. Griffin noticed that the dangling pipe was connected to the bucket of a large excavating machine by only a single attachment point and watched as it rotated into a position parallel to the trench and directly over the workmen's heads. When Griffin reached the trench, he  ____________________ 1The exquisite timing of this coincidence suggests that Emerson's epigram ("Wherever a man commits a crime, God finds a witness." Ralph Waldo Emerson, "Natural Religion," Essays ______ (1875)) may apply to breaches of administrative regulations as well as to violations of the criminal code. 4 discovered that it measured no less than six feet deep and four feet wide and had been dug in gravelly soil. No trench box was in place to guard against a cave-in (although Santone claimed that he and Camara had been measuring the trench to ascertain if it could accommodate one). Moreover, because the trench lay adjacent to the only road providing access to Deer Island, vibrations from traffic increased the risk of a cave-in. A gas pipe, six inches in diameter, traversed the width of the trench. Wells corroborated many of Griffin's observations. In due course, OSHA issued citations alleging three serious violations (one of which the Secretary later withdrew) and a repeat violation.2 The two serious violations (which we shall label "A" and "B") were as follows: A. Permitting employees to work beneath the suspended pipe in violation of 29 C.F.R. 1926.651(e) (1996) (which instructs that "[n]o employee shall be permitted underneath  ____________________ 2A serious violation occurs if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation. 29 U.S.C. 666(k). While the OSH Act does not define the term "repeat violation," courts typically require proof that the respondent violated the same standard on an earlier occasion in a substantially similar fashion. See, e.g., D & S Grading Co. v. ___ ____ __________________ Secretary of Labor, 899 F.2d 1145, 1147 (11th Cir. 1990); Bunge __________________ _____ Corp. v. Secretary of Labor, 638 F.2d 831, 836-37 (5th Cir. _____ ___________________ 1981); George Hyman Constr. Co. v. OSHRC, 582 F.2d 834, 838-39 ________________________ _____ (4th Cir. 1978). 5 loads handled by lifting or digging equipment"). B. Permitting workers to use a ladder that did not extend at least three feet above the top of the trench in violation of 29 C.F.R. 1926.1053(b)(1) (1996) (which directs that "[w]hen portable ladders are used for access to an upper landing surface, the ladder side rails shall extend at least 3 feet (.9m) above the upper landing"). The repeat violation (which we shall label "C") was as follows: C. Failing to provide an adequate protective system for workers in an unshored trench, in violation of 29 C.F.R.  1926.652(a)(1) (1996) (which provides that, except when excavations are made entirely in stable rock or are less than five feet in depth, "[e]ach employee in an excavation shall be protected from cave-ins by an adequate protective system"). The petitioner filed a timely notice of contest. At the outset of the hearing, it moved for disqualification on the ground that the ALJ, several years earlier (while employed as an attorney in the Department of Labor), had prosecuted one or more similar cases involving Gioioso. The ALJ refused to recuse himself. After considering the evidence, he found that the violations had in fact occurred, accepted OSHA's characterizations of them, and imposed penalties of $1,600 for each of the two serious violations and $8,000 for the repeat violation. Gioioso petitioned the Commission for discretionary review of the ALJ's decision. Its PDR called attention to only three issues (described infra Part IV). The PDR generated no _____ 6 interest and the ALJ's decision ripened into the Commission's final order.3 Gioioso then sought a judicial anodyne. III. THE JURISDICTIONAL ISSUE III. THE JURISDICTIONAL ISSUE We turn first to the jurisdictional quandary. In pressing its cause before this court, the petitioner raises not only the three issues which it enumerated in the PDR but also three additional issues, namely, whether the ALJ erred in (1) failing to recuse himself, (2) characterizing violation B as serious, and (3) assessing substantial penalties. The question, then, is whether Gioioso's failure to press these points in the PDR constitutes a forfeiture of the right to bring them before a reviewing court. We think that it does. We begin with bedrock. In the administrative state, exhaustion of administrative remedies is "generally required." Weinberger v. Salfi, 422 U.S. 749, 765 (1975). This requirement __________ _____ is more than a matter of form. "Insisting on exhaustion forces parties to take administrative proceedings seriously, allows administrative agencies an opportunity to correct their own errors, and potentially avoids the need for judicial involvement altogether." Portela-Gonzalez v. Secretary of the Navy, 109 F.3d ________________ _____________________ 74, 79 (1st Cir. 1997). In this way, the exhaustion doctrine creates a win-win situation: adhering to it simultaneously enhances the efficacy of the agency, fosters judicial efficiency,  ____________________ 3By its inaction, the Commission effectively adopted the ALJ's recommended findings and report. We sometimes will refer to these findings as if they had been made by the Commission in the first instance. 7 and safeguards the integrity of the inter-branch review relationship. See Power Plant Div., Brown & Root, Inc. v. OSHRC, ___ ____________________________________ _____ 673 F.2d 111, 113 (5th Cir. 1982); see also Ezratty v. ___ ____ _______ Commonwealth of Puerto Rico, 648 F.2d 770, 774 (1st Cir. 1981) ____________________________ (stating that the "doctrine serves interests of accuracy, efficiency, agency autonomy and judicial economy"). The OSH Act warmly embraces the exhaustion doctrine. It provides in relevant part that persons such as Gioioso who are "adversely affected or aggrieved by an order of the Commission" may obtain judicial review in the "court of appeals for the circuit in which the violation is alleged to have occurred." 29 U.S.C. 660(a). The right to judicial review, however, is carefully cabined. Congress specifically directed that "[n]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Id. The regulations complement the statute, ___ explaining that an aggrieved party's failure to file a PDR "may foreclose court review of the objections to the [ALJ's] decision." 29 C.F.R. 2200.91(f). Interestingly, the commentary accompanying this part of the regulations directs the reader to the Third Circuit's opinion in Keystone Roofing Co. v. OSHRC, 539 F.2d 960 (3d Cir. 1976), ____________________ _____ for guidance. The Keystone court considered the question of ________ whether the OSH Act "permits a reviewing court to consider an employer's objection to an OSHA citation which was argued to the 8 OSHA hearing examiner, but which was neither the subject of a petition to the . . . [Commission] for discretionary review, 29 C.F.R. 2200.91, nor the subject of review by the full Commission at the direction of a single member, 29 U.S.C.  661(i)." Id. at 961. The court answered this question in the ___ negative. See id. at 964. ___ ___ Although the rule announced in Keystone makes eminently ________ good sense both textually (that is, as a matter of statutory interpretation) and practically (that is, as a matter of policy), the petitioner attempts to elude its grasp. Gioioso first notes that the regulations say only that an aggrieved party's failure to file a PDR "may foreclose court review of . . . objections to ___ the [ALJ's] decision." 29 C.F.R. 2200.91(f) (emphasis supplied). Gioioso contends that the use of the word "may" implies that raising the objections in the PDR is not a prerequisite to judicial review. We disagree. For one thing, the regulations cannot alter the statutory scheme. For another thing, the statute leaves a door ajar for cases in which extraordinary circumstances obtain. See 29 U.S.C. 660(a). The ___ regulation's use of the verb "may" is no doubt intended to preserve this narrow exception to the exhaustion doctrine, not to widen it beyond all recognition.4 The petitioner has a fallback position. It maintains that it in fact "urged" the three omitted issues "before the  ____________________ 4We need not dwell on the exception itself as the petitioner does not even venture to suggest that extraordinary circumstances existed in this case. 9 Commission" in the statutorily required sense. The linchpin of this assertion is the petitioner's claim that urging an objection before the ALJ is functionally and legally equivalent to urging it before the Commission. The Fifth Circuit has encouraged the petitioner's view, suggesting in dicta that an objection might be preserved for judicial review if the aggrieved party articulated it sufficiently before the ALJ. See Cleveland Consolidated, Inc. ___ ____________________________ v. OSHRC, 649 F.2d 1160, 1165 (5th Cir. 1981) (assuming, without _____ deciding, that an issue had been preserved for judicial review because it was "evident from the record below," even though the aggrieved party did not specify it in the PDR). This dictum distorts the clear congressional intent.5 We believe it follows from the bifurcation of duties contained in the statutory scheme, as well as from plain meaning, that the OSH Act precludes judicial review of those objections not urged in front of the Commission. To be specific, the OSH Act acknowledges the existence of two separate adjudicators the Commission and the ALJs and assigns very different responsibilities to each. The Commission members, whom the President appoints based on their training, expertise, and experience, see 29 U.S.C. 661(a), carry out the broad ___ adjudicatory functions required by the OSH Act. Conversely, the ALJs' functions are case-specific. This division of labor  ____________________ 5This dictum goes much further than the position originally taken by the Fifth Circuit in McGowan v. Marshall, 604 F.2d 885, _______ ________ 889-91 (5th Cir. 1979). Our preference is for that court's earlier iteration. 10 carries with it disparate responsibilities, leaving in the Commission's hands the task of ensuring the development of a cohesive body of decisional rules which comport with the objectives of the OSH Act. Given this framework, we think that the wiser course is to construe the statute according to its letter. Only if an issue is actually called to the attention of the Commission, through the PDR or by a Commission member's spontaneous initiative, will the Commission have the informed opportunity that Congress intended a meaningful chance to correct a mistake before an order becomes final. Thus, the model that Congress envisioned can function optimally only if the aggrieved party alerts the Commission to those issues which that party thinks are worthy of review. Accord McGowan v. Marshall, 604 F.2d 885, 890- ______ _______ ________ 91 (5th Cir. 1979); Keystone, 539 F.2d at 963. ________ The language set forth in the OSH Act drives home the point. While the statute recognizes the existence of both the Commission and the ALJs, compare 661(a) with 661(e), it _______ ____ specifically precludes judicial review of those issues which "h[ave] not been urged before the Commission." 29 U.S.C.  ______________________ 660(a) (emphasis supplied). In our view, the omission of the term "ALJ" or words of like import from section 660(a) can only be regarded as intentional, not inadvertent. See Russello v. ___ ________ United States, 464 U.S. 16, 23 (1983) (explaining that "where ______________ Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally 11 presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (citation and internal quotation marks omitted); 2A Norman J. Singer, Sutherland Stat. ________________ Const. 47.23 (5th ed. 1992) (explaining that the inference that ______ an omission is an intentional exclusion is strengthened "where a thing is provided in one part of the statute and omitted in another"). In short, we agree with the Fifth Circuit's statement, albeit in a case that predates Cleveland Consolidated, ______________________ that "[t]he language of section 660(a) indicates that proceedings targeted towards the Commission, not those before the ALJs, are the predicate to judicial review." McGowan, 604 F.2d at 890. _______ The language of the statute is not only plain, but it is also fortified by the regulations (which, if ambiguity lurks, are deserving of deference, see Chevron U.S.A., Inc. v. Natural ___ ____________________ _______ Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)),6 and ________________________________ by the agency's stated adherence to the Third Circuit's seminal decision in Keystone, 539 F.2d at 964. Against this backdrop, we ________ are persuaded that merely raising an issue before the ALJ no matter how clearly fails to preserve the issue for judicial review. Something more is needed: the issue thereafter must be  ____________________ 6The regulations underscore the importance that the agency attaches to raising an issue before the Commission. 29 C.F.R.  ______ ___ __________ 2200.91(d) exemplifies this emphasis. It provides, inter alia, _____ ____ that a PDR should state specifically why review should be directed, including whether the ALJ's "decision raises an important question of law, policy or discretion" and "whether review by the Commission will resolve a question about which the Commission's [ALJs] have rendered differing opinions." These directives would be emptied of meaning if we construed the statute to relieve the aggrieved party of any responsibility to identify issues with particularity in the PDR itself. 12 brought to the Commission's attention either by its inclusion in a PDR or by the unilateral act of a single commissioner. Consistent with this conclusion, we next examine the PDR which Gioioso filed. We find absolutely no reference in it either to the alleged mischaracterization of the ladder violation or to the supposedly excessive nature of the penalty assessments. Because Gioioso failed to urge these objections before the Commission, we are without jurisdiction to entertain them. The recusal issue presents a variation on the theme. Although the PDR did not list this objection as an issue for review, there was a glancing mention of it in a footnote.7 The petitioner claims to have preserved the issue in this fashion. But the exhaustion doctrine demands more than oblique references, and the statute's use of the verb "urge" in this contest is telling. See Webster's Collegiate Dictionary 1300 (10th ed. ___ 1993) (defining "urge" as meaning "to present, advocate, or demand earnestly or pressingly" or "to declare, advance, or press earnestly a statement, argument, charge or claim"); The American Heritage Dictionary of the English Language 1965 (3d ed. 1992) (defining "urge" as "[t]o entreat earnestly and often repeatedly;  ____________________ 7The footnote reads in its entirety: Gioioso moved to recuse the ALJ based upon the fact that the ALJ had previously prosecuted Gioioso for similar citations while a solicitor and that prosecution could impact the ALJ's judgment in this case. The ALJ denied the motion. Later, Complainant introduced into evidence the settlement agreement in that case to establish the appropriateness of the penalty in this case. 13 exhort . . . [t]o present a forceful argument, claim, or case"). In an OSHA case, an objection is not "urged" in the requisite sense (and will not be deemed preserved for judicial review) unless the PDR conveys the substance of the objection face up and squarely, in a manner reasonably calculated to alert the Commission to the crux of the perceived problem.8 The petitioner's treatment of the recusal issue fails to meet this benchmark. As the PDR reads, the matter of recusal is little more than a passing comment, designed to provide information buttressing another argument rather than to carve out an independent ground for inquiry. Since the footnote failed to place the Commission on proper notice, it did not suffice to preserve the issue of recusal for judicial review. The upshot of the matter is simply this: in order to effectuate the statute that Congress wrote and assure the efficiency, effectiveness, and autonomy of the administrative structure, an aggrieved party desiring to preserve an issue for judicial review must raise it before the ALJ, articulate it clearly in its PDR, and offer a modicum of developed argumentation in support of it. See Durez Div. of Occidental ___ __________________________ Chem. Corp. v. OSHA, 906 F.2d 1, 5 (D.C. Cir. 1990) (refusing to ___________ ____  ____________________ 8To be sure, some courts have speculated that "[b]road language in a petition for review might be sufficient to satisfy this requirement." Power Plant, 659 F.2d at 1294 (quoting ____________ Cleveland Consolidated, 649 F.2d at 1164-65). But short of _______________________ holding that the Commission is satisfactorily alerted to an issue if it appears anywhere in the record below (a proposition that we already have rejected), no court has suggested that so nondescript a reference as is contained in the quoted footnote is enough to satisfy the imperative of section 660(a). 14 hear an issue listed as one of five issues in the PDR, but neither discussed nor supported by citations of authority therein); see also 29 C.F.R. 2200.91(d) ("[A] petition should ___ ____ concisely state the portions of the decision for which review is sought."); cf. Paterson-Leitch Co. v. Massachusetts Mun. ___ _____________________ ___________________ Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988) (holding ___________________ that to preserve an issue for review on an appeal from a magistrate's report to a district judge, a party must "spell out his arguments squarely and distinctly"). Because the petitioner did not satisfy this criterion with respect to three of its six putative issues, we lack jurisdiction to hear those issues in this proceeding. IV. THE MERITS IV. THE MERITS Our conclusion that we lack jurisdiction to hear three of the petitioner's six objections marks only the end of the beginning. We still must resolve the three preserved claims, namely, (1) whether substantial evidence supports the finding that the petitioner's employees worked below a suspended pipe (Violation A); (2) whether the Commission erred in finding that the petitioner's employees were exposed to trench-related hazards without an adequate protection system (Violation C); and (3) whether the record supports the rejection of the petitioner's unpreventable employee misconduct defense. We discuss each of these contentions separately, pausing first to delineate certain principles affecting the standard of appellate review. A. Principles Affecting Review. A. Principles Affecting Review. ___________________________ 15 A reviewing court customarily defers to an agency's reasonable interpretation of a statute that it administers. See ___ Chevron, 467 U.S. at 843-44 & n.11; Strickland v. Commissioner, _______ __________ _____________ Me. Dep't of Human Servs., 96 F.3d 542, 547 (1st Cir. 1996). The _________________________ impetus for deference escalates when the agency interprets its own regulations. See Lyng v. Payne, 476 U.S. 926, 939 (1986); ___ ____ _____ Udall v. Tallman, 380 U.S. 1, 16 (1965). In the final analysis, _____ _______ a reviewing court should respect an agency's interpretation of its own regulation as long as the interpretation meshes sensibly with the regulation's language and purpose. See Martin, 499 U.S. ___ ______ at 151. These principles apply to the regulations that the Secretary of Labor promulgated to implement the OSH Act. See id. ___ ___ at 152. The OSH Act, see 29 U.S.C. 660(a), incorporates the ___ basic judicial review provisions of the Administrative Procedure Act. Under those provisions, agency determinations should be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.  706(2)(A) (1994). The Commission's findings of fact are conclusive as long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. 660(a). The Court delineated the contours of the "substantial evidence" standard nearly half a century ago in Universal Camera Corp. v. NLRB, 340 ______________________ ____ U.S. 474, 477, 491 (1951), and they are by now too familiar to warrant repetition. We mention specially, however, that the 16 standard applies with undiminished force where, as here, an administrative body, like the Commission, does not itself hear witnesses but instead adopts an ALJ's findings of fact. See ___ Truck Drivers & Helpers Union, Local No. 170 v. NLRB, 993 F.2d ______________________________________________ ____ 990, 998-99 (1st Cir. 1993). As a corollary to the standard, the hearing examiner's credibility determinations are entitled to great deference. See General Dynamics Corp. v. OSHRC, 599 F.2d ___ ______________________ _____ 453, 463 (1st Cir. 1979). B. Violation A. B. Violation A. ___________ The Commission found that Gioioso breached the excavation standard, 29 C.F.R. 1926.651(e), which mandates that "[n]o employee shall be permitted underneath loads handled by lifting or digging equipment." The petitioner assigns error. We see none. The citation underpinning Violation A states in relevant part that Gioioso's personnel "were exposed to serious injury while working in a trench in which a section of 12" water line was being lowered." In adjudicating this citation, the ALJ credited the testimony of two compliance officers who described seeing a ten-foot section of cast metal pipe suspended from the bucket of an excavating machine by a chain sling. As the pipe moved, it rotated around the single point of suspension and passed over the heads of the men who were working in the trench. While the observations of the two compliance officers were not entirely congruent, the ALJ determined that the modest discrepancies in their accounts were easily explained by the 17 officers' differing vantage points. He also found that a photograph taken shortly thereafter corroborated their testimony. Keeping in mind the frailty of Gioioso's rebuttal its foreman, Santone, stated only that he did not recall the pipe passing overhead there is no principled basis on which a court could justify substituting its judgment for the factfinder's. See ___ General Dynamics, 599 F.2d at 463. ________________ C. Violation C. C. Violation C. ___________ The Commission found that Gioioso failed to provide an adequate protective system within the trench, thereby violating 29 C.F.R. 1926.652(a)(1). The petitioner again spies error. We do not. It is undisputed that the petitioner neglected to furnish a support system, shield system, or other adequate safeguarding within the trench as required by 29 C.F.R.  1926.652(c). Additionally, the petitioner failed to comply with the provisions of 29 C.F.R. 1926.652(b)(1)(i) (which delineates a protection option accomplished by the gradual sloping of the excavation's walls). But the regulations exempt some unsloped excavations that are less than five feet in depth, see id.  ___ ___ 1926.652(a)(1)(ii), and the petitioner seeks the shelter of this exemption. The petitioner hypothesizes that its workers never were exposed to the hazards inherent in an excavation exceeding five feet in depth because they were standing on a pipe that traversed the width of the trench. The ALJ rejected this defense: although he believed it was unlikely that the workmen 18 were standing on the floor of the trench when the compliance officers arrived, he found that "no matter where they were standing, [they] were still inside a trench that was not protected in accordance with 1926.652(a)(1)." We review this essentially legal judgment de novo. In reaching this conclusion, the ALJ relied heavily on Ford Dev. Corp., 15 O.S.H. Cas. (BNA) 2003 (1992). There, the ________________ employer claimed that its employees were supposed to stand on a pipe while in a trench, and that in so doing they effectively would be exposed to a depth of only 3.5 feet (the distance from the upper surface of the pipe to the top of the trench). The Commission rejected this argument. It noted that the depth exception applies only if an excavation is "less than 5 feet (1.52m) in depth and examination of the ground by a competent person provides no indication of a potential cave-in." 29 C.F.R. 1926.652(a)(1)(ii). The Commission then explained that "[t]he standard speaks of the depth of the trench, not of the position of employees in the trench." Ford Dev. Corp., 15 O.S.H. Cas. at _______________ 2011. On this basis, the Commission held that the depth exception did not apply. See id. ___ ___ The reasoning in Ford embodies a sensible construction ____ of the regulation and one that comports with its wording and purpose. The safety standard is implicated by the depth of a particular trench, without regard to an individual worker's 19 precise position in it.9 The notion that having workers stand on a laid pipe within a trench is a satisfactory method of protecting them from the risk of cave-ins is nonsense. While the regulations are performance-oriented, they only allow employers to choose from a limited universe of acceptable procedures, not to jury-rig convenient alternatives and impose them on an imperilled work force. See Conie Constr., Inc. v. Reich, 73 F.3d ___ ___________________ _____ 382, 384 (D.C. Cir. 1995). We have said enough on this score. Because the excavation regulation applies to the trench in question whereas the depth exception does not, the Commission's resolution of Violation C must stand. D. Unpreventable Employee Misconduct. D. Unpreventable Employee Misconduct. _________________________________ The Commission rejected the petitioner's affirmative defense of unpreventable employee misconduct (the UEM defense). The petitioner challenges this determination as a matter of law and as a matter of fact. We reject both challenges. The OSH Act requires that an employer do everything reasonably within its power to ensure that its personnel do not violate safety standards. But if an employer lives up to that billing and an employee nonetheless fails to use proper equipment  ____________________ 9The record in this case aptly illustrates the wisdom of this conclusion. A compliance officer, Griffin, testified to the close proximity of traffic on the adjacent roads and warned that this could cause vibrations along the trench walls, thus heightening the risk of a cave-in. If a cave-in occurred in a trench of this depth, Griffin believed that workers within it would "probably . . . be buried" regardless of where they were standing. 20 or otherwise ignores firmly established safety measures, it seems unfair to hold the employer liable. To address this dilemma, both OSHRC and the courts have recognized the availability of the UEM defense. The contours of the UEM defense are relatively well defined. To reach safe harbor, an employer must demonstrate that it (1) established a work rule to prevent the reckless behavior and/or unsafe condition from occurring, (2) adequately communicated the rule to its employees, (3) took steps to discover incidents of noncompliance, and (4) effectively enforced the rule whenever employees transgressed it. See New York State ___ ______________ Elec. & Gas Corp. v. Secretary of Labor, 88 F.3d 98, 105 (2d Cir. _________________ __________________ 1996); General Dynamics, 599 F.2d at 458-59; Jensen Constr. Co., ________________ __________________ 7 O.S.H. Cas. (BNA) 1477, 1479 (1979). The employer must shoulder the burden of proving all four elements of the UEM defense. See Brock v. L.E. Myers Co., ___ _____ ______________ 818 F.2d 1270, 1276 (6th Cir. 1987); General Dynamics, 599 F.2d ________________ at 459. Sustaining this burden requires more than pious platitudes: "an employer must do all it feasibly can to prevent foreseeable hazards, including dangerous conduct by its employees." General Dynamics, 599 F.2d at 458; accord H.B. _________________ ______ ____ Zachry Co. v. OSHRC, 638 F.2d 812, 818 (5th Cir. 1981). __________ _____ The mainstay of Gioioso's argument is that the ALJ unnecessarily required repetitive documentary proof referable to the UEM defense. But this is smoke and mirrors; the record reveals quite clearly that the ALJ applied the appropriate legal 21 standard in a wholly unremarkable way and found that the employer failed to carry the devoir of persuasion on both the implementation and enforcement components of the defense. This deficit is fatal. Even if an employer establishes work rules and communicates them to its employees, the defense of unpreventable employee misconduct cannot be sustained unless the employer also proves that it insists upon compliance with the rules and regularly enforces them. See Centex-Rooney Constr. Co., 16 ___ __________________________ O.S.H. CAS. (BNA) 2127, 2130 (1994). Contrary to the petitioner's insinuations, the ALJ did not presume to establish a per se rule requiring documentation. Rather, he counted the absence of documentation against the proponent of the defense in the circumstances of this case. We __________________________________ cannot fault this approach. Given the nature of the issue, there is no reason why a factfinder must accept an employer's anecdotal evidence uncritically. And in this instance, we agree with the ALJ that the absence of any vestige of documentary proof was not only a relevant datum but a telling one. The petitioner also questions whether the Commission's rejection of its UEM defense is supported by substantial evidence in the record. After giving due deference to the ALJ's credibility determinations, we conclude that the ruling passes muster. While the record reflects that Gioioso made a meaningful effort to develop a satisfactory safety program, it is much less conclusive on the issues of implementation and 22 enforcement. The petitioner's best case is that it distributes safety manuals to all new employees; that these manuals contain information regarding, inter alia, the lifting of loads, methods _____ ____ of trench protection, and the proper placement of ladders in trenches; and that it supplements these materials in various ways. The petitioner's safety chairman testified that the company sponsors weekly "toolbox talks" at its work sites,10 monthly safety meetings for supervisory personnel, and biennial safety seminars for all employees. But this evidence left some fairly conspicuous gaps as to the content of the training exercises, who conducted each session, and who attended them. Documentation say, syllabi or attendance rosters would have gone a long way toward filling these gaps, but the petitioner proffered none. Absent such documentation, it cannot persuasively argue that it effectively communicated the rules to its employees. The ALJ found most compelling the lack of any substantial evidence in the record that the petitioner effectively enforced its safety program. It provided no evidence of unscheduled safety audits or mandatory safety checklists, and no documentation that it ever executed its four-tiered disciplinary policy. This lacuna in the proof undermines its attempt to mount a viable UEM defense. See Hamilton Fixture, 16 ___ ________________ O.S.H. Cas. (BNA) 1073, 1090 (1993) (finding the evidence  ____________________ 10The safety chairman submitted a newsletter published by the National Utility Contractors Association summarizing various representative "toolbox talks." 23 insufficient where there was no proof to establish adequate enforcement even though the written work rule was adequate), aff'd, 28 F.3d 1213 (6th Cir. 1994). Even when a safety program _____ is thorough and properly conceived, lax administration renders it ineffective (and, thus, vitiates reliance on the UEM defense). See Brock, 818 F.2d at 1274, 1278 (in which the ALJ rejected a ___ _____ UEM defense when the employer could not produce records evidencing employees' receipt of safety manuals, the occurrence of safety meetings, and the like). Brock also illustrates another point which has _____ pertinence here. The Brock court regarded the circumstances _____ surrounding the actions of the employer's foreman as further evidence that the employer's program was lax. See id. at 1277. ___ ___ The case at hand is not dissimilar; Santone, the petitioner's foreman, in effect acknowledged that his actions directly contravened the company's safety policies. And while the petitioner argues that a foreman should not be regarded as a supervisor, the company's own safety manual identifies the foreman as the "safety foreman for his crew," instructs employees to "listen to your foreman" in respect to safety matters, and directs foremen (along with other company safety officers) to inspect work sites regularly and to enforce safety rules. Seen in the context of these instructions, the foreman's breach of safety rules supplies the basis for an inference that the employer's implementation of safety procedures and/or its enforcement policies left something to be desired. See id.; see ___ ___ ___ 24 also H.B. Zachry, 638 F.2d at 819. The same circumstance also ____ ___________ buttresses the ALJ's finding that Gioioso's employees probably were unaware that a threat of disciplinary action existed for nonobservance of safety rules. Finally, it bears mentioning that one of the violations (Violation C) is a repeat violation. Recent violations provide some evidence of ineffective safety enforcement. See Jensen ___ ______ Constr. Co., 7 O.S.H. Cas. at 1479 & nn. 5-6. The ALJ was ___________ entitled to draw such an inference here. We need go no further. Taking into account the totality of the circumstances and the allocation of the burden of proof, we find the petitioner's claim that the Commission improperly rejected its UEM defense to be without merit. The petition for review is denied and dismissed. The petition for review is denied and dismissed. _______________________________________________ 25