[NOT FOR PUBLICATION - NOT TO BE CITED AS PRECEDENT]

# United States Court of Appeals
## For the First Circuit

No. 01-1060

RIVERDALE MILLS CORP.,
Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW
COMMISSION AND SECRETARY OF LABOR,
Respondents.

ON PETITION FOR REVIEW OF AN ORDER OF THE
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

[Hon. G. Marvin Bober, Administrative Law Judge]

Before

Boudin, Chief Circuit Judge,

John R. Gibson,[*] Senior Circuit Judge,

and Torruella, Circuit Judge.

Warren G. Miller, on brief, for petitioner.
Judith E. Kramer, Acting Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, Ann Rosenthal, Counsel for Appellate Litigation, and Scott Glabman, Attorney, U. S. Department of Labor, were on brief, for respondent.

---

[*]Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

**JOHN R. GIBSON, <u>Senior Circuit Judge</u>.**  After a worker at Riverdale Mills caught his hand in a flattening machine, the Occupational Safety and Health Review Commission found Riverdale Mills Corporation had committed two serious violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (1994 and Supp. IV 1998): failing to install an adequate safety guard on the machine and failing to properly select the appropriate hand protection gear for people operating the machine.  Riverdale petitions for review of the Commission's order. It contends that the accident was not caused by the glove the worker was wearing, so the hand protection violation is not supported by substantial evidence.  As for the safety guard issue, Riverdale contends that it provided an adequate guard in the form of a trip wire over the front of the machine.  Furthermore, even if the trip wire was not an adequate guard, the company contends it established affirmative defenses by showing there was no feasible alternative to the trip wire, that other guard devices would create a greater hazard than the unguarded machine, and that the accident was caused by unpreventable employee misconduct.  We deny the petition for review.

**I.**

Riverdale Mills makes wire mesh for use in lobster traps. A few of its customers require that the mesh be flattened, and to accomplish this, Riverdale uses a machine called the Peck Shear and Flattener, which can be used both to cut the mesh and to flatten it. The machine flattens the mesh by feeding it between a series of upper and lower rollers. The upper and lower rollers do not meet in pairs, but are offset, with each upper roller about a half to three-quarters of an inch behind the preceding lower roller. The machine operator inserts a large panel of wire mesh over the first roller until the panel catches under the second roller, which draws the panel into the machine. The Peck machine at Riverdale was fitted with a trip wire across the front of the machine, which would stop the rotation of the rollers in response to pressure on the wire.

The wire mesh panels are coated with zinc, which makes them rough to the touch, and they have cut edges, or selvages, which can cut and puncture the hands of people handling them. Most of the Riverdale employees who have to handle this kind of panel wear gloves to protect their hands.

On April 2, 1999, Riverdale employee Panagis Bebedelis was feeding wire mesh panels into the flattener when he caught his hand in the machine. He screamed, and another employee came to his aid, pulling the trip wire to stop the machine. Two Riverdale employees freed Bebedelis from the machine, but he had broken three fingers.

-3-

OSHA inspectors investigated the incident, interviewing Riverdale employees, including Bebedelis. At the conclusion of the investigation, the Secretary of Labor issued a Citation and Notification of Penalty to Riverdale, alleging two serious violations of OSHA regulations. The first citation alleged violation of 29 C.F.R. § 1910.138(b)[2] in that Riverdale's selection of hand protection measures was not based on an evaluation of the performance characteristics of the hand protection relative to the potential hazards. In particular, the citation alleged:

> (a) SHEAR DEPT.--EMPLOYEES HAD BEEN OFFERED THE OPTION OF USING GLOVES BY THE EMPLOYER TO PROTECT THEIR HANDS WHILE HANDLING GALVANIZED WIRE; BUT ON OR ABOUT 4/2/99, AN EMPLOYEE WAS ALLOWED TO WEAR GLOVES WHILE MANUALLY FEEDING WIRE PANELS INTO THE PECK SHEAR FLATTENER, EXPOSING EMPLOYEE TO IN RUNNING NIP POINTS BETWEEN THE ROTATING ROLLS AT THE OPERATOR'S STATION.

The second citation alleged violation of 29 C.F.R. §

---

[2]29 C.F.R. § 1910.138 (1998), which was the regulation in effect at the time of the accident, provided:

> (a) <u>General requirements</u>. Employers shall select and require employees to use appropriate hand protection when employees' hands are exposed to hazards such as those from skin absorption of harmful substances; severe cuts or lacerations; severe abrasions; punctures; chemical burns; thermal burns; and harmful temperature extremes.
> (b) <u>Selection</u>. Employers shall base the selection of the appropriate hand protection on an evaluation of the performance characteristics of the hand protection relative to the task(s) to be performed, conditions present, duration of use, and the hazards and potential hazards identified.

1910.212(a)(1),[3] in that "[m]achine guarding was not provided to protect operator(s) and other employees from hazard(s) created by in-running nip point(s)." The citation specified that "ON OR ABOUT 4/2/99, AN OPERATOR OF A PECK SHEAR FLATTENER. . . GOT HIS LEFT HAND CAUGHT IN AN UNGUARDED IN-RUNNING NIP POINT BETWEEN THE FIRST TWO ROLLS OF THE FLATTENER WHILE MANUALLY FEEDING GALVANIZED WIRE PANELS AT THE OPERATOR'S STATION."

Riverdale contested the citation before the Commission. The Commission referred the case to an Administrative Law Judge, who held

---

[3]29 C.F.R. § 1910.212 (1998), General requirements for all machines, provided in relevant part:

(a) Machine guarding--(1) Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are--barrier guards, two-hand tripping devices, electronic safety devices, etc.
(2) General requirements for machine guards. Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible. The guard shall be such that it does not offer an accident hazard in itself.
(3) Point of operation guarding. (i) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

a hearing.  With regard to the hand protection violation, the ALJ found:

> At the time of the accident, [Riverdale] had a written rule prohibiting the use of gloves near moving machinery. However, [Riverdale] gave employees the option of wearing gloves while operating the flattener function of the Peck machine to protect their hands from cuts, abrasions and punctures. [Riverdale's] policy of allowing employees to wear gloves if they wanted to when using the flattener was clearly contradictory to the work rule prohibiting the use of gloves near moving machinery.  The company properly identified the hazard of wearing gloves near moving machinery, and it also properly identified the hazard of cuts, abrasions and punctures from handling the wire mesh panels.  However, instead of evaluating these two hazards in conjunction and devising work rules that would give clear instruction to employees and provide protection against both hazards, [Riverdale] had a policy that was by its own terms contradictory and that put employees in the position of having to choose between the hazard of broken fingers and/or crushed hands and hazards such as cuts, abrasions and punctures.

Based on these findings, the ALJ concluded that the Secretary established the elements of an OSHA violation of the hand protection regulation: that the regulation applied, the employer violated the regulation, the employees had access to the violative condition, and the employer knew of the condition.  Furthermore, the ALJ found the violation was serious because there was a substantial probability that the use of gloves around moving machinery could have resulted in serious physical harm.

In considering the alleged machine guard violation, the ALJ found that section 1910.212(a)(1) applied to the Peck Shear and Flattener because the place where the upper and lower rollers were in

-6-

close proximity, rotating in opposing directions, created the kind of nip point that triggered the need for a safety guard. The trip wire did not function as a safety guard, so Riverdale violated the regulation. It was undisputed that employees had access to the violative condition for about twelve hours a month. It was obvious from the warnings that Riverdale issued to its employees about the machine that Riverdale knew of the dangerous condition. Thus, the Secretary established all the elements of an OSHA violation in regard to the lack of a safety guard on the machine.

The ALJ rejected Riverdale's affirmative defense that the trip wire was the only feasible means of guarding the nip point that would not destroy the Peck machine's utility. The ALJ found that there were at least two feasible types of guards, and indeed, that Riverdale had installed such devices by the time of the hearing. After the accident, Riverdale installed a light curtain on the Peck machine. A light curtain is a system of infrared lights that will shut off the machine if something breaks the light beam. At first the curtain would shut the machine off almost every time anyone loaded a panel into the machine, but Riverdale installed a foot switch that allowed the operator to turn the machine back on with his foot. After the accident, Riverdale also installed a funnel, which extended out from the Peck machine to form a barrier between the operator and the rollers and which had only a narrow slit to receive the panels. The ALJ found

that if the funnel were modified to narrow the opening and to situate the funnel farther away from the rollers, the funnel would function as an effective safety guard for the Peck machine. The ALJ rejected Riverdale's defense that the funnel would pose a hazard in its own right; Riverdale did not apply for a variance pursuant to section 6(d) of the OSH Act, and this failure made the "greater hazard" defense unavailable to Riverdale. Moreover, the ALJ rejected, as not credible, evidence from Riverdale's witnesses that the funnel presented a hazard.

Finally, the ALJ rejected Riverdale's assertion that the accident was a result of unavoidable employee misconduct. Riverdale contended that employees had been instructed not to hold the panels once the machine had accepted the leading edge, but the evidence showed that most if not all the employees kept their hands on the panels to push them into the machine. Riverdale also contended that Bebedelis was talking instead of concentrating on his job, but the evidence showed that Bebedelis had a habit of talking while working, and Riverdale had not adequately disciplined him to prevent recurrence of this conduct. Thus, the ALJ found liability for the machine guard violation, and he concluded the violation was serious.

The penalty was set at a total of $4,900 for the two violations. Riverdale sought review, but the Commission did not elect to review the ALJ's decision. Consequently, the ALJ's decision became

the final order of the Commission.

## II.

The Occupational Health and Safety Act, 29 U.S.C. § 660(a), prescribes the standards for judicial review of the Commission's orders. Under section 660(a), we must defer to the Commission's findings of fact if they are supported by substantial evidence on the record as a whole. P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 115 F.3d 100, 108 (1st Cir. 1997). The substantial evidence standard applies with equal force where the Commission has adopted an ALJ's findings of fact rather than conducting its own hearing. Id. More generally, we will uphold agency determinations unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id.

## III.

Riverdale first argues that the hand protection violation was not supported by substantial evidence because Bebedelis caught his sleeve, not his glove, in the Peck machine. We need not delve into the controversy between glove and sleeve because the violation charged

would exist no matter which item of clothing was involved in the accident. The violation alleged was failure to consider the relevant hazards in deciding what hand protection employees should use. As the ALJ pointed out, Riverdale recognized two hazards, that of gloves being caught in moving machinery, and that of bare hands being cut or punctured by the wire panels. Of the two hazards, the possibility of catching a glove in a moving machine had more serious consequences. Rather than adopting a hand protection policy that took into account two simultaneous hazards, Riverdale adopted one policy forbidding use of gloves around moving machinery, but then allowed employees to wear gloves when using the Peck machine in order to avoid cuts. These contradictory policies forced employees to choose which hazard to protect against, thereby exposing them to one hazard or the other, unabated. This constituted a violation of 29 C.F.R. § 1910.138 no matter what may have caused the Bebedelis accident. The Secretary's determination was supported by substantial evidence.

**IV.**

Riverdale argues that it complied with 29 C.F.R. § 1910.212(a) by equipping the Peck machine with a trip wire that would

stop the machine.  The ALJ found that the trip wire did not effectively guard the machine, as demonstrated by the fact that Bebedelis's hand went into the machine without activating the trip wire.  The record contains substantial evidence that the trip wire did not "prevent the operator from having any part of his body in the danger zone during the operating cycle."  Section 1910.212(a)(3)(ii).

In what is apparently a contention of legal error, Riverdale argues that the trip wire complied with an "appropriate" standard as required by section 1910.212(a)(3)(ii) because it satisfied a standard set by the American National Standards Institute for roll-forming and roll-bending machines.  OSHA has not incorporated the cited American National Standards Institute document by reference in the regulation, and it is therefore not an applicable standard within the meaning of the regulation.  See Secretary of Labor v. George C. Christopher & Son, Inc., No. 76-647, 1982 WL 189089, at *6 (O.S.H.R.C. Feb. 26, 1982).  Moreover, examination of the American National Standards Institute definitions shows that that organization distinguishes between emergency stop controls, such as the trip wire on the Peck machine, and guards, which prevent entry into the point of operation or other hazard area.  The Commission's decision that the Peck machine was not guarded in accordance with 29 C.F.R. § 1910.212(a) is not  arbitrary or capricious.

Riverdale raises three affirmative defenses:  that it was

-11-

infeasible to guard the machine; that the guard proposed by the ALJ would present a greater hazard than the unguarded machine; and that the Bebedelis accident was caused by unpreventable employee misconduct. Riverdale has the burden of proof on these affirmative defenses. See E & R Erectors, Inc. v. Secretary of Labor, 107 F.3d 157, 163 (3d Cir. 1997).

The ALJ rejected the impossibility and greater hazard defenses for the simple reason that Riverdale had already fitted the Peck machine with a light curtain and a funnel device, which, with adjustments, would satisfy the machine guard requirement. Riverdale argues that the funnel device poses a greater hazard than the unguarded machine. The ALJ specifically found incredible Riverdale's evidence that the funnel was dangerous. Nelson Barnes, the OSHA assistant area director, testified at the hearing that he had extensive experience in machine guard safety. Barnes testified that the funnel device would minimize or eliminate the danger from the Peck machine's rollers. He was examined at length about the possibility that workers' hands could be trapped in the funnel guard itself, and he steadfastly maintained that it was more likely that the workers' hands would be ejected from the funnel, rather than being mashed against it. This was substantial evidence to support the ALJ's conclusion that the funnel guard was a feasible means of compliance with the regulation.

Even if the funnel guard, which Riverdale installed on its

-12-

own initiative, were dangerous, it was still Riverdale's burden to prove the absence of alternative means of protecting the employees. See PBR, Inc. v. Secretary of Labor, 643 F.2d 890, 895 (1st Cir. 1981). The ALJ found that the light curtain was a feasible alternative. Riverdale does not argue that the light curtain does not work or that it creates a hazard in its own right, but only that it increases wear and tear on components of the machine.  Riverdale's CEO, James M. Knott, who designed the Peck machine, said that the light curtain "works."  The ALJ had before him substantial evidence that Riverdale did not carry its burden of proof on its defenses.

Finally, Riverdale contends that the Bebedelis accident was caused by the misconduct of Bebedelis himself, who was guilty of talking and not handling the panel properly.  According to Riverdale, Bebedelis should have let go of the panel as soon as it caught in the rollers.  Riverdale contends Bebedelis caused the accident by holding on to the panel and letting his fingers go through the holes in the mesh.  The ALJ found that most of the employees who used the Peck machine kept their hands on the panels after the panels had caught in the rollers, because they were correcting the angle at which the bowed panels were entering the machine.  If the employees were routinely pressing on the panels as the panels fed through the machine, the other employees were in danger of having their fingers caught in the mesh as Bebedelis did.  This manner of handling the panels was not isolated and

-13-

unpreventable misconduct. The ALJ also found that Bebedelis was well-known for talking while he worked, and Riverdale had failed to discipline him effectively to prevent this conduct. There was evidence that Riverdale had not done all it could to eliminate the employee conduct to which it attributes the accident. <u>See</u> <u>Secretary of Labor</u> v. <u>Falcon Steel Co.</u>, Nos. 89-2883 & 89-3444, 1993 WL 155690, at *18-20 (O.S.H.R.C. April 27, 1993). These findings are supported by substantial evidence.

We have considered Riverdale's various other arguments and conclude there are no meritorious grounds for review. Accordingly, we deny the petition for review.

<u>Denied.</u>