Restore et al v. US Dept. Agriculture CV-97-435-B    01/20/98

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Restore: The North Woods, et al.**

v.                                          C-97-435-B

**U. S. Department of Agriculture, et al.**

MEMORANDUM AND ORDER

Loon Mountain Recreation Corporation ("Loon") operates the Loon Mountain ski area. Because part of the ski area is located in the White Mountain National Forest, Loon's operations require a special use permit issued by the United States Department of Agriculture ("DOA") through its subsidiary agency the United States Forest Service ("Forest Service"). 16 U.S.C.A. § 497b (West Supp. 1997). At issue in this case is the Forest Service's approval of Loon's proposal to construct and operate a snow-making pipeline running from the East Branch of the Pemigewasset River ("East Branch") to the top of Loon Mountain. Plaintiffs argue that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 (c)(1) (1994), by (1) approving the pipeline proposal without first conducting either an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS"); and (2) considering the pipeline's potential

environmental impacts separately from other aspects of Loon's expansion plan.

Plaintiff Restore: The North Woods ("Restore"), an environmental group with several members who live in the Loon Mountain area, filed this action seeking to enjoin the Forest Service from allowing Loon to construct and operate the pipeline. Restore has been joined in its claims by intervenors Roland C. Dubois, a frequent visitor to the Loon Mountain area; James F. Miles, a property owner at and frequent visitor to Loon Mountain; and Slide Slope Realty Trust, a real estate trust owning property adjacent to Loon Mountain. Loon has intervened as a defendant.

The matter initially came before me on plaintiffs' motions for a temporary restraining order and a preliminary injunction. At oral argument, however, all parties agreed to consider this order the final determination on the merits. Therefore, I determine plaintiffs' claim for permanent injunctive relief.


## I.   Background

### A.   Loon's Expansion Plan

Loon has sought to expand its operations for over a decade. In 1993, the Forest Service issued a Record of Decision ("ROD") approving an expansion plan described in the project's Final Environmental Impact Statement ("FEIS").[1]  The plan would have

---

[1]  The actual process was much more complex, drawn-out, and contentious than this summary would indicate. For a more detailed discussion of the project's background, see Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1277-80 (1st Cir. 1996).

allowed Loon to improve its existing facilities and expand onto additional Forest Service land. In the existing permit area, Loon would have widened established trails, added several new trails and one new lift, and improved existing lifts and restaurant facilities. In the new permit area, Loon would have added a new lift and nine new trails. Loon would also have constructed a new base lodge and an additional parking lot on private land at the base of the new lift.

The plan would also have allowed Loon to significantly expand its snow-making system by installing new snow-making pipes and extending snow-making to all trails in both the existing and new permit areas. Although Loon would have continued to use its three pre-expansion water sources — the East Branch, Boyle Brook, and Loon Pond — for its snow-making operations, Loon Pond would have become its principle water source. Loon would have been permitted to draw the pond down by as much as fifteen feet for snow-making, and the Town of Lincoln, which had in the past used the pond as a source for drinking water, would have been permitted to draw the pond down by as much as five additional feet. As a mitigation measure, the proposed expansion plan would have required Loon to biannually refill the pond with water pumped through its snow-making system from the East Branch. The proposed expansion plan would also have imposed other restraints on Loon's use of water from the East Branch and Loon Pond.

Dubois and Restore sued the Forest Service and Loon shortly after the Forest Service issued the ROD, claiming that the Forest

Service's consideration of the plan violated NEPA and that the plan itself violated the Clean Water Act. I rejected both claims, but the Court of Appeals reversed my decision. See Dubois v. United States Dep't of Agric., 102 F.3d 1273 (1st Cir. 1996). Accordingly, I issued a permanent injunc-tion on May 5, 1997 ("the May 5 Order") enjoining Loon from proceeding further with its expansion plan without first complying with the Clean Water Act and submitting the plan for NEPA review. As Loon had already completed certain aspects of the plan, I allowed it to use the new facilities until it could submit a revised expansion plan. However, I limited Loon's right to withdraw water from Loon Pond and barred it from discharging East Branch water into the pond while the review was underway.

B. **The Pipeline Proposal**

With its expansion plan on hold, and its ability to with-draw water from Loon Pond restricted, Loon proposed to construct a new snow-making pipeline to serve its existing facilities. The pipeline, which has since been completed, runs from the East Branch to the top of Loon Mountain, traveling within existing trails and utility corridors and through a 50-foot patch of trees. It gives Loon the capacity to pump up to 200 million gallons of water per season. The pipeline is approximately 6,750 feet long, 4,500 feet of which runs underground, requiring a trench four feet deep and wide. Approximately 60 feet of the above-ground portion required blasting to level the terrain. Loon also constructed a new intake gallery and pumphouse at the

-4-

East Branch on privately owned land to supply the pipeline with water.

## C.   **The CEQ Regulations and the Forest Service Handbook**

Because Loon operates on federal land pursuant to a special use permit, it had to submit the pipeline proposal to the Forest Service for approval.  Federal agency approval of a construction activity such as the pipeline qualifies as a "major federal action" that triggers the NEPA process.  42 U.S.C.A. § 4332(c); 40 C.F.R. § 1508.18(a).

In enacting NEPA, Congress created the Council on Environmental Quality ("CEQ") in order to, among other things, "develop and recommend to the President national policies to foster and promote the improvement of environmental quality . . . ."  42 U.S.C.A. §§ 4342-4347 (1994).  Pursuant to this mandate, the CEQ has promulgated regulations with the avowed purpose of implementing NEPA's "action-forcing" measures.  40 C.F.R. § 1500.1(a); see also 42 U.S.C.A. § 4731 et seq. (1994).  The regulations broadly command federal agencies to interpret and administer all laws, policies, and regulations in accordance with the policies set forth in NEPA. 40 C.F.R. § 1500.2(a).  They also  "tell agencies what they must do to comply with the procedures and achieve the goals of [NEPA]."  40 C.F.R. §§ 1500.1, 1500.3; see also Exec. Order No. 11,991, 42 Fed. Reg. 26967 (1977) (commending all federal agencies to "comply with the [CEQ regulations] except where such compliance would be inconsistent with statutory requirements.").

The CEQ regulations require agencies to follow a three-step process when determining whether to prepare either an EA or an EIS for proposed action. First, the agency must prepare an EIS if the proposed action is one which normally requires an EIS. 40 C.F.R. § 1501.4(a)(1). If an EIS is not required at step one, the agency must determine whether the action qualifies under a "categorical exclusion." Id. § 1501.4(a)(2). A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." Id. § 1508.4. Further NEPA review ordinarily will not be required if a proposed action appears to qualify for categorical exclusion. However, the regulations require agencies to develop procedures that provide for "extraordinary circumstances" in which a normally excluded action will be ineligible for exclusion because it "may have a significant environmental effect." Id. If the need for an EIS cannot be ruled out by determining that the proposed action qualifies for a categorical exclusion, the agency must prepare an EA.[2] Id. § 1501.4(b). The agency then must either prepare an EIS or issue a "finding of no significant impact." Id. § 1501.4(b)-(e),

_____

[2] The CEQ regulations define an EA as "a concise public document for which a Federal agency is responsible that serves to: (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact"; and "(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary." 40 C.F.R. § 1508.9.

1508.13. In summary, the regulations require that any proposed action must be reviewed either in an EA or an EIS unless it is eligible for categorical exclusion. Diagram No. 1 provides a visual depiction of this three-step process.

In determining whether a proposed action could have a significant environmental impact, the CEQ regulations require an agency to consider both the context in which the action will occur and the intensity of any potential impacts resulting from the action. 40 C.F.R. § 1508.27. In evaluating an impact's intensity, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulative significant impact on the environment." Id. § 1508.27(b)(7). The regulations further state that "significance cannot be avoided by terming an action temporary or breaking it down into small component parts." Id. Finally, the regulations define the term "cumulative impact" in such a way as to require the agency to consider the impact of a proposed action when it is "added to other past, present and reasonably foresee-able future actions." Id. § 1508.7.

The CEQ regulations also require each agency to establish policies and procedures to ensure that the regulations are implemented in a consistent manner. Id. § 1507.3(a). The Forest Service has complied with this requirement by establishing environmental policies and procedures designed to provide guidance for analyzing and documenting the environmental

consequences of proposed actions.  See 57 Fed. Reg. 43180, 43188 (1992).  These policies and procedures are found in Section 1909.15 of the Forest Service Handbook ("FSH").

The FSH tracks the CEQ regulations in describing the method for determining whether an EIS must be prepared.  First, it establishes four classes of actions that normally require an EIS.  FSH § 20.6; see 40 C.F.R. § 1501.4(a)(1).  If a proposed action does not fall within one of the classes of actions requiring an EIS at step one, the FSH provides that the Forest Service must determine whether the action is eligible for categorical exclusion.  See FSH § 30.3; 40 C.F.R. § 1501.4(a)(2).  In this regard, the FSH provides that a "proposed action may be categorically excluded from documentation in [an EA or EIS] only if the proposed action ... [i]s within [an applicable category] and there are no extra-ordinary circumstances related to the proposed action."  FSH § 30.3.1(b).  The FSH then lists several categories of actions that will qualify for categorical exclusions if no extraordinary circumstances are present.  See id. § 31.1(b) & 31.2.  It also provides a non-exclusive list of "extraordinary circumstances," FSH § 30.2, and defines the term as "[c]onditions associated with a normally excluded action that are identified during scoping as potentially having effects which may significantly affect the environment."  Id. § 30.5.  Thus, the FSH both recognizes certain specified circumstances that will always qualify as extraordinary if they are "related" to the proposed action, and provides for additional unspecified

-8-

circumstances which may be considered extraordinary if the facts suggest that the proposed action potentially may have a significant impact on the environment.  See id. §§ 30.2, 30.5.

## D.  **The Decision Memo**

On August 26, 1997, a District Ranger of the Forest Service issued a Decision Memo concluding that the pipeline did not require either an EA or an EIS because it was eligible for categorical exclusion.[3]  Although she noted the presence of several conditions listed in the FSH as "extraordinary circumstances" — namely, steep slopes, erosive soils, wetlands, and a municipal watershed — she concluded that "the mere presence of these conditions does not preclude the use of categorical exclusions so long as effects are not significant . . . ." Decision Memo at DM-7.  She then proceeded to address each enumerated extraordinary circumstance and concluded that because none of the circumstances would cause the pipeline to have a significant impact on the environment, it could be categorically

---

[3]  Specifically, the District Ranger concluded that the pipeline could be excluded as "[a]dditional construction or reconstruction of existing telephone or utility lines in a designated corridor."  Decision Memo at DM-7; FSH § 31.2.2.  The Decision Memo states that with the exception of a 50-foot section, the new pipeline will lie within a utility corridor currently used for both a water supply pipeline and an electricity transmission line.  Decision Memo at DM-7. Alternatively, the District Ranger concluded that the pipeline could be excluded as an "[a]pproval, modification, or continuation of minor special uses of National Forest System lands that require less than five contiguous acres of land."  Id. at DM-7.  "Examples include but are not limited to: ... Approving the use of land for a 40-foot utility corridor that crosses one mile of a National Forest."  FSH § 31.2.3 (d).  The Decision Memo notes that the pipeline would require only 0.62 acres of Forest Service land.  Decision Memo at DM-7.

excluded from the need for further review. Id. at DM-7-9.

The District Ranger also considered and rejected the plaintiffs' argument that the pipeline proposal had to be considered in conjunction with Loon's expansion plan. In response to a public comment that the pipeline proposal was "inexorably intertwined" with Loon's expansion plan, the District Ranger noted that the two matters could be separately considered because: "[a] review of the pipeline proposal shows that it is independent of any potential expansion. If no expansion were ever proposed, LMRC would still need to change its snow-making system to allow it to comply with the May 5 order and still maintain a competitive position in the ski resort business." Decision Memo, Responses at 4-5.

Since Loon had already obtained all other permits and approvals needed to construct the pipeline, it was free to begin construction as soon as the Forest Service issued the Decision Memo. By the time that the matter came before me for consideration, the pipeline had been substantially completed.

## II. Analysis

### A. Standard of Review

NEPA does not contain its own standard of review. Therefore, Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701 et seq.(1996), governs the scope of judicial review of an agency's compliance with NEPA. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375 (1989); Sierra Club v.

-10-

<u>Marsh</u>, 976 F.2d. 763, 769 (1st Cir. 1992) ("Sierra Club III"). Consequently, a reviewing court may hold unlawful an agency action, finding, or conclusion only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . ." <u>Conservation Law Foundation, Inc. v. Secretary of the Interior</u>, 864 F.2d. 954, 957 (1st Cir. 1989) (quoting 5 U.S.C. § 706(2)(A)).

This standard is highly deferential and demands that the reviewing court presume that an agency action is valid. <u>Sierra Club III</u>, 976 F.2d. at 769 (citing <u>Citizens To Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971)). Before deferring to an agency's decision the reviewing court must satisfy itself that the agency has made a "reasoned decision based upon its evaluation" of the available information. <u>Oregon Natural Resources Council</u>, 490 U.S. at 378. More specifically, the First Circuit requires that the reviewing court "look to see if the agency decision, in the context of the record, is too 'unreasonable' (given its statutory and factual context) for the law to permit it to stand." <u>Sierra Club III</u>, 976 F.2d. at 769 (emphasis omitted) (quoting <u>Sierra Club v. Marsh</u>, 769 F.2d 868, 871 (1st Cir. 1985) ("Sierra Club I")).

An agency's legal judgments are also entitled to deference in certain instances. When an agency construes a statute or a regulation that it is charged with administrating, the court must defer to the agency's interpretation so long as it is not

-11-

"manifestly contrary to the statute." [4]  Clifton v. Federal Election Commission, 114 F.3d 1309, 1318 (1st Cir. 1997) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-44 (1984))(statute); Auer v. Robbins, 117 S. Ct. 905, 911 (1997) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945))(regulation); Gioioso & Sons, Inc. v. Occupational Safety & Health Review Commission, 115 F.3d 100, 107 (1st Cir. 1997).  With these standards in mind, I first consider plaintiffs' claim that the pipeline is ineligible for categorical exclusion even if it is considered in isolation.  I  then address their contention that the proposal should have been evaluated together with Loon's expansion plan.

B.    **Categorical Exclusion**

Plaintiffs offer both legal and factual arguments to support their claim that the Forest Service improperly excluded the pipeline from further environmental review.  First, they argue that the pipeline is ineligible for exclusion because the District Ranger found that extraordinary circumstances were "present" and the mere presence of such circumstances makes an

---

[4]  Certain agency actions may constitute nothing more than statements of policy that are not binding on the agency. See Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).  The Ninth Circuit has determined that the Forest Service need not comply with the FSH because it is a policy manual that does not have the force and effect of law. Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996); Western Service Radio Services, Inc. v. ESPY, 79 F.3d 896, 901 (9th Cir. 1996).  I do not address this difficult issue here because defendants do not argue that the relevant provisions of the FSH lack the force and effect of law.

action ineligible for exclusion as a matter of law. Second, they argue that the District Ranger abused her discretion in finding that the construction and operation of the pipeline would have no significant impact on the environment. I address each argument in turn.

### 1. Plaintiffs' Legal Argument

The FSH permits the Forest Service to rely on a categorical exclusion "only if the proposed action . . . [i]s within [an applicable category] and there are no extraordinary circumstances related to the proposed action." FSH § 30.3.1(b) (emphasis added). Plaintiffs apparently assume that extraordinary circumstances are "related" to a proposed action if they are "present." Accordingly, they argue that the pipeline proposal is ineligible for categorical exclusion because the District Ranger conceded that extraordinary circumstances were present at the pipeline site.

The Forest Service, in contrast, asserts that an action may be categorically excluded even if extraordinary circumstances are present so long as the circumstances could not cause the proposed action to have a potentially significant impact on the environment. Although it has not offered a hermeneutical justification, its position depends upon a different understanding of the term "related." Under this interpretation, extraordinary circumstances would not be related to a proposed action unless they could cause the action to have a potentially significant impact on the environment.

I am not free to choose a preferred interpretation in resolving this dispute. Instead, the Forest Service's construction must be accepted unless it is manifestly erroneous. See e.g., Auer v. Robbins, 117 S. Ct. at 911. This forgiving standard is easily satisfied here. First, the Forest Service's interpretation is consistent with the categorical exclusion process established by the CEQ regulations. These regulations require only that "any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental impact." 40 C.F.R. § 1508.4. They do not in any way prohibit an agency from requiring that extraordinary circumstances must cause a proposed action to have a potentially significant environmental impact before such circumstances could prevent the action from qualifying for categorical exclusion.

Second, the Forest Service's interpretation is consistent with the language and purpose of the FSH's categorical exclusion procedures. The term "related" is commonly understood to mean "connected by reason of an established or discoverable relation." Webster's Third International Dictionary (1993) at 1916. It is certainly plausible to argue that the mere presence of extra-ordinary circumstances at the site of a proposed action is sufficient to qualify the circumstances as "related." However, it is equally plausible to require that an extraordinary circumstance must cause a proposed action to potentially have a significant environmental impact before it could be sufficiently

-14-

connected to the proposed action to be deemed "related."  This argument is even more persuasive when it is considered in the context of the EIS process as a whole.  The overriding purpose of this process is to force agencies that must approve a proposed action to consider its  potentially significant environmental impacts.  See, Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).  This purpose would be fully served by adopting a categorical exclusion procedure that permits actions to be eligible for exclusion so long as no extraordinary circumstances could cause the action to have a significant impact on the environment.

Finally, the drafting history of the FSH's categorical exclusion procedure supports the District Ranger's interpretation.  The Forest Service attempted to revise its categorical exclusion procedure in 1991.  The proposed revisions provided in pertinent part that:  "[a] proposed action may be categorically excluded from documentation in an [EA or an EIS] only if the proposed action . . . (b) Falls within [an applicable category]; and (c) Does not involve any extraordinary circum-stances."  56 Fed. Reg. 19718, 19743 (1991) (emphasis added).  The current categorical exclusion procedure, with its requirement that the extraordinary circumstances must be "related" to the proposed action, was adopted in 1992 in response to public comments on the 1991 proposal.  In explaining why it had modified the 1991 proposal, the Forest Service stated that it was responding to concerns that "'extraordinary circumstances' were

not well defined [in the 1991 proposal] and the mere presence or absence of one of the listed circumstances was insufficient to determine if an action was or was not to be placed in a category for exclusion." 57 Fed. Reg. 43183 (emphasis added). This statement suggests that the Forest Service adopted the "related" requirement in order to clarify its position that more than the mere presence of extraordinary circumstances was required before a proposed action could become ineligible for categorical exclusion.

In summary, the Forest Service's construction of its categorical exclusion procedure is not manifestly incorrect. No more is required to uphold the District Ranger's interpretation in this case. See, e.g., Southwest Center for Biological Diversity, 100 F.3d at 1450 (Forest Service may categorically exclude proposed action even though extraordinary circumstances are present if the proposed action will not have a significant environmental impact); Southwest Center for Biological Diversity v. Glickman, 939 F. Supp. 1189, 1195 (D. Ariz. 1996) (same); Mahler v. United States Forest Service, 927 F. Supp. 1559, 1571-72 (S.D. Ind. 1996) (same).

## 2. The Factual Argument

Plaintiffs next argue that the District Ranger arbitrarily failed to consider evidence in the record demonstrating that the construction and operation of the pipeline will have a significant environmental impact on both the East Branch and the surrounding environment.

### (a) The Pipeline's Impact on the East Branch

The new pipeline will enable Loon to withdraw more water from the East Branch than it is able to withdraw using its current system. Plaintiffs argue that the District Ranger was arbitrary and capricious in concluding that the increased withdrawals would not have a significant impact on the river. Based on my review of the Decision Memo and the administrative record, I find that her conclusion is adequately supported by the record and, therefore, is not arbitrary or capricious.

Loon required a dredge and fill permit issued by the New Hampshire Department of Environmental Services ("NHDES"), to construct the pipeline's new intake galley and pumphouse. Project File, at 317. As a condition of the permit's issuance, the NHDES imposed a limit on Loon's ability to withdraw water from the East Branch when the river's flow rate is equal to or less than 62 cubic feet per second ("cfs"). Id. at 301, 326. The permit also establishes a "step-down" approach to East Branch withdrawals: 10 years after the date of the permit's issuance, or at such a time as Loon constructs water storage ponds, the flow limit below which Loon may not withdraw water from the East Branch increases from 63 cfs to 85 cfs. Id. at 317. The NHDES mandates that any changes in withdrawal pumping rates "must occur in such a manner that flows in the river immediately downstream of the withdrawal point do not vary more than 3.5 cfs per half hour." Id. at 326, 327 n.1, 328 n.5. As long as Loon abides by these restrictions, it may take as much water from the East

Branch as the capacity of its new pipeline permits.

The flow restrictions limit Loon's access to water from the East Branch regardless of whether Loon operates its current snow-making system or the new pipeline. The new pipeline, however, gives Loon a greater capacity to withdraw water from the East Branch during periods of permissible flow rate than Loon could withdraw using its existing system. The crux of plaintiffs' argument is that the District Ranger arbitrarily failed to properly evaluate the effect that these increased withdrawals could have on the river.

I reject plaintiffs' argument because the record contains ample evidence to support the District Ranger's conclusion that withdrawals at flow levels in excess of 62 cfs would not impact the river. The 1992 FEIS for Loon's expansion plan described the environmental effects of a variety of water withdrawal scenarios. For example, the FEIS states that Loon could actually withdraw from the East Branch at flows levels as low as 32 cfs prior to undertaking any expansion. FEIS at 150. Indeed, the pre-expansion scenario provided for withdrawals at the lowest flow level of all alternatives considered in the environmental review of Loon's proposed expansion. ROD at 10; FEIS at 150. Never-theless, the Forest Service concluded that continued water withdrawals from the East Branch at such a low flow level would not have impacted downstream users of the river. FEIS at xii, 147, 153. Moreover, the FEIS concluded that even allowing for withdrawals at the pre-expansion level of 32 cfs, water quality

-18-

degradation would be "very unlikely and of a very small magnitude." Id. at 150. Therefore, the District Ranger could have reasonably concluded that the NHDES permit flow limits of 62 cfs in the short term and 85 cfs in the longer term "provide a significant additional measure of security that impacts would not occur." See id. at 156; Decision Memo, Responses at 11. Indeed, the FEIS states that with a flow limitation of 85 cfs, "the potential for impact to the stream ecosystem would be eliminated." FEIS at 167.

I cannot conclude that the District Ranger was arbitrary and capricious in relying on the extensive record establishing that water withdrawals from East Branch at flow levels of greater than 62 cfs will not significantly effect the East Branch. Rather, I find that the District Ranger's decision was perfectly consistent with her NEPA-imposed duties.

### (b)  The Pipeline's Other Potential Impacts

Although the District Ranger undertook a detailed evaluation of the pipeline's potential impact on the East Branch, she made little effort to consider how the operation of the new pipeline might effect other aspects of the environment. Such consideration was unnecessary, she concluded, because the pipeline was intended to replace snow-making capacity that Loon lost as a result of the May 5 Order. Plaintiffs challenge this conclusion for two reasons. First, they contend that the District Ranger was obligated to consider the pipeline's potential environmental impact even if it merely replaced snow-making capacity that Loon

-19-

lost as a result of the May 5 Order.  Second, they challenge the District Ranger's conclusion that the new pipeline merely replaced lost snow-making capacity.  I agree with the plaintiffs on both counts.

The May 5 Order sets the current legal baseline for  Loon's snow-making operations.[5]  Although the order does not prohibit Loon from engaging in any properly approved expansion of its snow-making capacity, its legal effect in establishing the baseline against which future expansion plans are to be measured cannot be disregarded.  The fundamental flaw in the District Ranger's analysis is that she ignored this baseline in evaluating whether the pipeline's additional snow-making capacity could have a significant impact on the environment.

By all accounts, the new pipeline, intake gallery, and pumphouse will enable Loon to make more snow than it could make by operating its current facilities in accordance with the May 5 Order.  The new pipeline is more than thirty percent wider than Loon's existing pipeline (16 inches in diameter as opposed to 12 inches).  That wider pipeline will be supplied with water by a

---

[5]  I issued the May 5 Order at the direction of the First Circuit Court of Appeals.  See Dubois, 102 F.3d at 1294.  The Forest Service submitted the order in draft form for my approval and the other parties -- Loon, Restore and Dubois -- all agreed to its terms.  In issuing the order, I did not intend to limit Loon's ability to make snow provided that any new snow-making facilities were constructed in accordance with state and federal law.  However, the May 5 Order does not authorize any new construction.  Thus, to the extent that Loon proposes new construction that would otherwise require state and federal approvals, it cannot rely on the May 5 Order to avoid the need for such approvals.

pump that has more than twice as much pumping capacity as Loon's current pump.  See Project File at 203 (5,000 gallons per minute as opposed to 2,000 gallons per minute).

The District Ranger completely failed to consider the potentially significant environmental impact that could result from the new pipeline's increased snow-making capacity.  The record reveals that soil erosion is a constant concern at Loon Mountain.  FEIS at 134-35, 137.  That the expansion FEIS devoted significant space to discussing the possible effects that each proposed snow-making scenario might have on the mountain's surface -- including soil erosion, increased runoff, and the possibility of increased soil flow into the East Branch -- illustrates that these considerations are important in assessing the impact of any project that has the potential to increase Loon's snow-making capacity.  See FEIS, 133-138.  Although the District Ranger considered the impact that the construction of the pipeline could have on soil erosion and recommended certain measures to mitigate this potential impact, Decision Memo, at DM-7, she did not consider the impact that an increased amount of snow might have on the erosion problem.

The District Ranger also failed to consider other potential effects such as increased crowds on the mountain and the host of environmental concerns that skiers bring with them: more cars, car exhaust, congestion, and parking problems.  Again, the expansion FEIS analyzed such potential effects of the various proposed expansion alternatives in detail.  FEIS at 193-213,

-21-

215-224; ROD at 13. It therefore stands to reason that before declaring that there is no uncertainty as to the pipeline's potential environmental impact, the District Ranger should at least consider the potential effects of a decision by Loon to use the full capacity of this proposed pipeline to increase its snow-making capacity. See FSH § 30.3, 30.5; 40 C.F.R. § 1508.4.

Even if it were appropriate to measure the potential environmental impact of the new pipeline against an estimate of Loon's past snow-making capacity rather than its current author-ized capacity, the District Ranger's decision would still be arbitrary and capricious because it is based on an insupportable conclusion as to Loon's past snow-making capacity. The District Ranger states that prior to the May 5 Order, Loon had unrestricted access to the top 15 feet of Loon Pond as well as the ability to refill the Pond with water from the East Branch. Id. In contrast, the May 5 Order limits Loon's use of Loon Pond to four feet and prohibits Loon from discharging East Branch water into the Pond. Id. at DM-5. The District Ranger states that these restrictions deprive Loon of 93 million gallons of water per year to which it was previously entitled. Id.

The record, however, shows conclusively that not only did Loon never truly have access to the top fifteen feet of Loon Pond, but also that Loon has never in practice used anywhere near that amount of water. Rather, it appears that the notion that Loon could withdraw the top 15 feet of water from Loon Pond and refill the Pond arose only in a proposed alternative for expan-

-22-

sion.  See FEIS at 144-45.  Because the First Circuit's decision nullified the expansion plan, that figure cannot possibly serve as a basis for Loon's "current" level of operations.  Moreover, the record shows that the combined use of Loon Pond by both Loon and the Town of Lincoln, which uses the Pond as a source of drinking water, has amounted to only the top four to six feet of Loon Pond in any given year.  FEIS at 88.  Indeed, in setting the terms of the May 5 Order, all parties, including Loon and the Forest Service, agreed that the four-foot draw-down figure represented the depth to which both users have historically drawn Loon Pond down in recent years.  Transcript of April 11, 1997 hearing, 3-4, 73-81.  Consequently, to the extent that the District Ranger relied upon the unsupportable conclusion that the new pipeline will merely replace "lost" Loon Pond water, I find her reasoning wholly inconsistent with the record and, therefore, arbitrary and capricious.

In failing to consider the potential effects of increased snow-making on the mountain, the District Ranger "entirely failed to consider an important aspect of the problem" and, consequently, issued an uninformed decision.  See Dubois, 102 F.3d at 1285 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  Having concluded that the District Ranger's decision to categorically exclude the pipeline project rather than prepare an EA or EIS was arbitrary and capricious, I find, that Plaintiffs' succeed on the merits of their claim that the District Ranger's decision to categorically

exclude the pipeline violated NEPA.

## C.    **Segmentation**

NEPA requires that when an agency makes an initial determination as to whether a proposed action may result in a significant environmental impact, the agency cannot "segment" the project from other related actions.  Rather, the CEQ regulations require Federal agencies to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(5).  Further, the regulations provide that "significance cannot be avoided by terming an action temporary or breaking it down into small component parts."  40 C.F.R. § 1508.27(b)(7).[6]  Relying on

_____

[6] The CEQ regulations also require that separate but related actions should be considered in the same EIS if they qualify as "connected actions," "cumulative actions," or "similar actions."  40 C.F.R. § 1508.25.  However, this section of the regulations describes a process referred to as "scoping" that comes into play only after the agency has determined that the proposed action will be considered in an EIS.  See 40 C.F.R. § 1502.4.  ("Agencies shall make sure that the proposal which is the subject of an [EIS] is properly defined" by considering the factors set forth in § 1508.25)(emphasis added).  Although the FSH requires the Forest Service to engage in scoping on all projects, not only those warranting an EIS, the FSH also grants the respective agency official significant leeway in conducting that scoping.  In this regard, the FSH provides that "[b]ecause the nature and complexity of a proposed action determines the scope and intensity of the required analysis, no single technique is required or prescribed.  Except where required by statute or regulations, the responsible official may adjust or combine the various stages in the process outlined" in the FSH.  FSH § 11, 57 Fed. Reg. at 43194.  A reasonable interpretation of this language is that the responsible official may decline to apply the specifics of the FSH's scoping provisions so long as she complies with the CEQ regulations.  Therefore, because the CEQ regulations require the Forest Service to apply § 1508.25 only when a project will be subject to an EIS, the District Ranger did not abuse her discretion in not considering its provisions here, where she has determined that the project has independent utility and that it

these regulations, plaintiffs challenge as arbitrary the District Ranger's conclusion that the pipeline could be considered separately from Loon's expansion plan because the pipeline has independent utility whether or not the larger expansion plan is eventually approved.[7]

As noted above, a reviewing court customarily defers to an agency's reasonable interpretation of a statute or regulation that it administers. See Lyng v. Payne, 476 U.S. at 939; Gioioso & Sons, 115 F.3d at 107-08 (citing Chevron, 467 U.S. at 843-44 & n.11). Therefore, I must defer to the Forest Service's interpretation of the CEQ regulation "so long as the interpretation meshes sensibly with the regulation's language and purpose." See

does not warrant an EIS.

[7] Plaintiffs also contend that the District Ranger failed to consider the impact of the pipeline in conjunction with two other structures built concurrently with the pipeline. Loon has constructed a water intake gallery and a new pumphouse on the bank of the East Branch that will supply the new pipeline with water. Decision Memo at DM-2. Contrary to Plaintiffs' contention, however, the District Ranger did consider the impact of the pipeline when used in conjunction with these two structures. Because these two structures were built on private land, their construction fell outside of the Forest Service's regulatory jurisdiction. Id. No less than eight separate federal and state agencies were involved in evaluating and/or permitting the intake gallery and pumphouse. Id. The District Ranger reviewed more than 400 pages of reports, evaluations. correspondence, and permits compiled by these various agencies, See Project File at 271-689. She evaluated this data with reference to the use of these structures in conjunction with the proposed pipeline and concluded that "these activities will not individually or cumulatively have a significant effect on the quality of the human environment." Decision Memo at DM-2. After carefully reviewing the pertinent portion of the administrative record dealing with the effects of these activities, I find that there is a sufficient basis in the administrative record to support her conclusion.

<u>Gioioso & Sons</u>, 115 F.3d at 107; <u>Methow Valley Citizens Council</u>, 490 U.S. at 359 (Forest Service's interpretation of own regulations is controlling unless "plainly erroneous or inconsistent with the regulation").

I cannot conclude that the Forest Service's interpretation is "plainly erroneous or inconsistent with the regulation." <u>See</u> <u>Methow Valley Citizens Council</u>, 490 U.S. at 359. Rather, reference to a project's independent utility "meshes sensibly," <u>see</u> <u>Gioioso & Sons</u>, 115 F.3d at 107, with the notion of determining whether the project is "<u>related</u> to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7) (emphasis added). Moreover, at least one Circuit Court of Appeals has agreed with the Forest Service's interpretation. <u>See</u> <u>Airport Neighbors Alliance</u>, 90 F.3d at 430. The Tenth Circuit has repeatedly articulated the test for whether a particular action is related to other actions with cumulatively significant impacts as whether the actions were "so interdependent that it would be unwise or irrational to complete one without the others." <u>Id.</u>, (quoting <u>Park County Resource Council, Inc. v. United States Dep't of Agric.</u>, 817 F.2d 609, 623 (10th Cir. 1987), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Village of Los Ranchos De Albuquerque v. Marsh</u>, 956 F.2d 970, 973 (10th Cir.), <u>cert.</u> <u>denied</u> 506 U.S. 817 (1992)); <u>see</u> <u>also</u> <u>Communities, Inc. v. Busey</u>, 956 F.2d 619, 627 (6th Cir.), <u>cert. denied</u>, 506 U.S. 953 (1992); <u>Save Barton Creek Ass'n v. Fed. Highway Admin.</u>, 950 F.2d 1129, 1139 (5th Cir.), <u>cert. denied</u>, 505 U.S. 1220 (1992); <u>Webb</u>

-26-

v. Gorsuch, 699 F.2d 157, 161 (4th Cir. 1983) (same).

The District Ranger's segmentation analysis is also consistent with the underlying purpose of the regulation which is to ensure that parties are not able to circumvent the NEPA process by breaking down a larger project that has a significant impact into a series of smaller projects that individually lack significant impacts.  See 40 C.F.R. § 1508.27(b)(7); Save Barton Creek Ass'n, 950 F.3d at 1139.  There is no danger here that the pipeline project will escape NEPA review.  As I have already explained, the District Ranger will have to reconsider her conclusion that the pipeline is eligible for categorical exclusion.  Moreover, the larger project, Loon's expansion plan, will also be subject to the full NEPA review process.  In the larger project's EIS, the Forest Service will have to consider any improvements, such as this pipeline, that Loon has made after initially proposing expansion.  Consequently, neither the pipeline project nor Loon's larger expansion plan will escape NEPA review as a result of the District Ranger's finding that the pipeline project has an independent utility and therefore may proceed independently of Loon's larger expansion.[8]

---

[8]  In Kleppe v. Sierra Club, the Supreme Court stated that it was not necessary that an agency "complete a comprehensive impact statement on all proposed actions before approving any of the projects."  427 U.S. 390, 414 n.26 (1976).  Rather, an agency could approve one pending project and then "take into consideration the environmental effects of the existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals."  Id., quoted in Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 71 (D.C. Cir. 1987).  To hold otherwise would have the impractical result of barring any party that has submitted a comprehensive plan for agency

-27-

In summary, the District Ranger plausibly construed the CEQ's segmentation regulation to permit a proposed action to be considered separately from other proposed actions if it has independent utility. Further, the record amply supports her conclusion that the pipeline proposal had such independent utility. Accordingly, she did not act arbitrarily in concluding that the pipeline proposal need not be considered in the same EIS in which other aspects of Loon's expansion plan will be considered.

## III.  CONCLUSION

For the reasons stated above, the Forest Service erred in determining that the pipeline project was eligible for exclusion without first considering whether the increase in snow-making capacity that would result from the construction and operation of the new pipeline could have a significant impact on the environment. Whether this error warrants injunctive relief, however, is not something that I can determine on the present record. Rather, I must first balance the parties' competing claims of injury and "must consider the effect on each party of the granting or withholding" of such relief. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987); Weinberger v.

---

approval from making any independently justifiable improvements until the agency approves the larger comprehensive project. Such a holding might actually encourage parties to surreptitiously segment their larger projects into smaller ones and discourage them from being forthright and notifying the respective agency of their larger plans.

-28-

<u>Romero-Barcelo</u>, 456 U.S. 309, 313 (1982); <u>Conservation Law Found,</u> <u>Inc. v. Busey</u>, 79 F.3d 1250, 1272 (1st Cir. 1996). Accordingly, I will hold a further hearing on February 26, 1998 at 10:00 a.m. to address this issue. At this hearing, the parties will have the opportunity to present evidence relevant to the harms they would suffer upon the granting or withholding of injunctive relief.

    SO ORDERED.


                           _____
                           Paul Barbadoro
                           Chief Judge

January 20, 1998

cc:  Grant T. Kidd, Esq.
     Cindy E. Hill, Esq.
     T. David Plourde, Esq.
     Alexander Kalinski, Esq.
     Evan Slavitt, Esq.
     Garry R. Lane, Esq.
     Jed Z. Callen, Esq.