IBP, INC., Appellee,

v.

IOWA EMPLOYMENT APPEAL
BOARD, Appellant.

No. 98–477.

Supreme Court of Iowa.

Dec. 22, 1999.

Thomas J. Miller, Attorney General, Thomas D. McGrane, and Bruce Kempkes, Assistant Attorneys General, and Gail Sheridan–Lucht, Des Moines, for appellant.

David H. Goldman of David H. Goldman, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and TERNUS, JJ.

McGIVERIN, Chief Justice.

Iowa Beef Processors, Inc. (IBP) was fined a total penalty of $125,500 by the Iowa labor commissioner for alleged violations of Iowa Code chapter 88. (1993), the Iowa Occupational Safety and Health Act (IOSHA), and its rules and regulations. The alleged violations were charged after an ammonia leak occurred at the IBP meat packing facility in Council Bluffs, Iowa. An employee of a subcontractor performing cleaning services at the IBP facility died of exposure to ammonia. The Iowa Employment Appeal Board (EAB or the agency) upheld the penalty.

Upon IBP's petition for judicial review, the district court reversed the decision of the EAB. The EAB now appeals the district court's ruling.

Upon our review, we affirm in part and reverse in part the decision of the district court and remand the case to the agency for calculation of reduced penalties consistent with this opinion.

## I. Background facts and proceedings.

We briefly summarize the facts giving rise to this case. Additional relevant facts will be discussed in analyzing each specific workplace safety violation charged against IBP.

On June 30, 1993, an ammonia leak occurred at an IBP meat packing facility in Council Bluffs. The leak occurred when the ammonia line was opened by an employee who did not know that a valve in the line had been removed. When the ammonia line was opened, ammonia began leaking through the opening in the line into the cut room floor area of the plant.

Rather than evacuate the plant as instructed through their training procedures, several IBP employees, including supervisors, entered the plant after the plant evacuation signal had sounded to locate a worker performing cleaning services who was missing and presumed down. The cleaning services employee was employed by NSCI, a subcontractor, and not by IBP. The IBP employees eventually located the NSCI employee and pulled him from the plant. The NSCI employee later died of exposure to ammonia.

After the June 30 ammonia leak, an inspection of the IBP facility was conducted by IOSHA representatives. Thereafter, the IOSHA Administrator, acting under authority of the labor commissioner,[1] issued various citations against IBP, which alleged serious, willful and repeated violations of Iowa Occupational Safety and Health rules, with a proposed total penalty of $314,400.

IBP sent the Division of Labor a notice of intent to contest the alleged violations found by the IOSHA Administrator.

Thereafter, the labor commissioner issued a complaint against IBP. *See* Iowa Code § 88.8. IBP filed an answer and a statement of affirmative defenses.

After an evidentiary hearing, an administrative law judge (ALJ) issued an amended proposed decision upholding, as modified, the citations and penalties of the IOSHA Administrator.

---

1. The IOSHA Administrator is a representative of the Iowa labor commissioner, as indicated on the citations. Pursuant to Iowa Code section 88.8(3), the Iowa employment appeal board acts as an adjudicatory body during a hearing where an employer challenges a citation.

IBP appealed the ALJ's decision to the Iowa Employment Appeal Board. The board affirmed the ALJ's ruling, but reduced the penalty imposed against IBP to $125,500.

IBP filed a petition for judicial review in district court. *See* Iowa Code §§ 17A.19, 88.9(1).

After a hearing, the district court reversed the decision of the board and dismissed all charged violations against IBP.

The board appeals. *See* Iowa Code § 17A.20.

## II. Standard of review.

We believe it helpful to first clarify the proceedings before the ALJ and the employment appeal board. Iowa Code section 88.8(3) provides that an employer who intends to contest a citation issued under Iowa Code section 88.7 shall be afforded an opportunity for an hearing. The parties agree here that the action before the ALJ and the appeal board was a contested case proceeding. *See* Iowa Code § 17A.2(5) (defining contested case proceeding as one where legal rights, duties or privileges of a party are required by the Constitution or statute to be determined by an agency after an opportunity for an evidentiary hearing).

■■■ Therefore, upon review of a district court's ruling on a petition for judicial review in a contested case proceeding, we apply the standards in Iowa Code section 17A.19(8)(f) to the agency action to determine whether our conclusions are the same as those of the district court. *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12, 14 (Iowa 1993). On such matters, our scope of review is for correction of errors at law. *E.N.T. Associates v. Collentine*, 525 N.W.2d 827, 829 (Iowa 1994). The agency's findings of fact are binding on us if they are supported by substantial evidence when the agency record is viewed as a whole. Iowa Code § 17A.19(8)(f); *E.N.T. Associates*, 525 N.W.2d at 829. Evidence is substantial if a reasonable person would find it adequate to reach a conclusion. *Simonson v. Snap–On Tools Corp.*, 588 N.W.2d 430, 434 (Iowa 1999). We may affirm, reverse, modify or grant any other appropriate relief, equitable or legal. Iowa Code § 17A.19(8).

## III. Background law regarding workplace safety standards.

IBP is subject to the requirements of Iowa's Occupational Safety and Health Act, Iowa Code chapter 88 (hereinafter IOSHA or the Act). Iowa Code chapter 88 is patterned after the federal Occupational Safety and Health Act, 29 U.S.C. § 651 (1994). The federal law imposes two duties on employers. "First, an employer has a general duty to 'furnish . . . employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to [its] employees.'" *New York State Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104 (2d Cir. 1996) (quoting 29 U.S.C. § 654(a)(1)); *see also* Iowa Code § 88.4. Second, an employer has a duty to comply with the more specific safety and health standards promulgated under the federal law. *Id.*; 29 U.S.C. § 654(a)(2); *see also* Iowa Code § 88.4. In this case, the order imposing liability on IBP is apparently based on IBP's failure to comply with the "special duty" clause, *see* 29 U.S.C. § 654(a)(2), Iowa Code section 88.4, by failing to comply with specific workplace safety standards.

Under the federal law, the United States Secretary of Labor promulgates mandatory safety and health standards applicable to particular businesses.[2] *P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Comm'n*, 115 F.3d 100, 102 (1st Cir.1997) (citing 29 U.S.C. § 651(b)(3)). The Secretary of Labor, act-

---

**2.** The term "occupational safety and health standard" is defined as a "standard which requires conditions, or the adoption or use of one or more practices, means, methods, oper-
ations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8).

ing through the Occupational Health and Safety Administration (OSHA), enforces those standards by conducting investigations, issuing citations, and by assessing monetary penalties. *See* 29 U.S.C. §§ 657 59; *P. Gioioso & Sons, Inc.*, 115 F.3d at 102; *New York State Elec. & Gas Corp.*, 88 F.3d at 103. The Occupational Safety and Health Review Commission (Commission) adjudicates alleged violations and serves as the "neutral arbiter" between the government regulatory body and an employer. *New York State Elec. & Gas Corp.*, 88 F.3d at 103; *see* 29 U.S.C. §§ 651(b)(3), 659, 661.

Iowa has adopted the federal safety standards and rules promulgated by the Secretary of Labor. *See* Iowa Code §§ 88.3(6), 88.5(1)(c); Iowa Admin. Code r. 875 10.20 (1998). The standards promulgated by the Secretary of Labor that are applicable to this case are codified at 29 C.F.R. part 1910. Thus, the relevant standards applicable in this case will be cited by reference to the Code of Federal Regulations citation.

IBP's alleged violations of workplace safety rules stemming from the ammonia leak can be grouped into three categories: (1) violation of emergency response/evacuation standards; (2) violation of respiratory/breathing protection standards; and (3) violation of energy control standards/lockout/tagout procedures. The majority of the items charged in the citations were for a serious violation of workplace safety standards as opposed to a willful violation. The distinction between a serious and willful violation will be explained later. For clarification, all alleged violations will be assumed to be a serious violation, unless otherwise indicated.

## IV. Failure to have an emergency response plan—Citation 1, Items 1–7f.

### A. The applicable workplace safety standards—29 C.F.R. § 1910.120(q).

IBP was charged in Citation 1, Item 1, by the IOSHA Administrator with failure to have an emergency response plan in place, as required by section 29 C.F.R. § 1910.120(q), for purposes of responding to the release of a hazardous substance such as an ammonia leak. 29 C.F.R. § 1910.120(q) provides in part:

> (1) *Emergency response plan.* An emergency response plan shall be developed and implemented to handle anticipated emergencies prior to the commencement of emergency response operations. The plan shall be in writing and available for inspection and copying by employees, their representatives and OSHA personnel.

An emergency response plan must address certain topics related to emergency preparedness including pre-emergency planning, personnel roles, lines of authority, training, and communication, emergency recognition and prevention, site security and control, evacuation routes and procedures, emergency medical treatment and others. 29 C.F.R. § 1910.120(q)(2).

Pursuant to the following language of 29 C.F.R. § 1910.120(q)(1), an employer is exempt from the duty to develop an emergency response plan if the employer's disaster plan calls for evacuation and does not permit any employees to assist in handling the emergency:

> *Employers who will evacuate their employees from the danger area when an emergency occurs, and who do not permit any of their employees to assist in handling the emergency, are exempt from the requirements of this paragraph* if they provide an emergency action plan in accordance with § 1910.38(a) of this part.

The phrase "assist in handling the emergency" is understood by the parties to mean emergency rescue operations. In other words, if an employer's disaster plan calls for evacuation of employees during an emergency, and specifically states that employees are not to engage in emergency

rescue operations, the employer is not required to develop an emergency response plan.

### B. IBP's disaster readiness plan.

IBP's compilation of procedures for responding to workplace emergencies is referred to as the written disaster readiness plan. The disaster readiness plan for the Council Bluffs facility outlines specific procedures to follow in the event of a major ammonia leak as listed below:

1. Evacuate the area immediately.
2. Immediately notify the Plant Manager and Plant Engineer. Supply the Plant Engineer with accurate information pertaining to evacuation and the source of the leak.
3. After area has been completely evacuated, close all doors to seal area off, containing the gas as much as possible.
4. Once the Plant Engineer or designee has been notified, he will *organize a rescue and repair team. This will consist of qualified maintenance personnel instructed in the use of respirators and ammonia protection suits.*

(Emphasis added.)

### C. The sequence of events during the ammonia leak.

According to the record, the ammonia system at the IBP facility in Council Bluffs was not adequately cooling the cut floor area of the plant on June 30, 1993. IBP maintenance supervisor, Perry Jones, discussed with maintenance superintendent Darrell Jourdan the need to troubleshoot a valve on the ammonia refrigeration line to increase the flow of ammonia to the coolers. Jones' shift began at 4:00 p.m. and he was the senior IBP official present at the plant after that time.

Sometime after 4:00 p.m., it was decided that an intermediate valve on the ammonia refrigeration line should be removed. Supervisor Jones instructed IBP maintenance employee William Grote in removing the valve, which was taken to the supply room for repair or replacement.[3] As a result, a gap was left in the ammonia line pipe. Grote did not tagout or lockout the intermediate ammonia valve which he had removed and neither Grote, Jones, nor anyone else informed other workers at the plant that they would be working on the ammonia system.

Later that evening, at approximately 9:30 p.m., maintenance employee Blaine Oswalt went to the roof and opened the main ammonia valve in order to begin cooling down the cut floor. The opening of the main ammonia valve was apparently a routine procedure at this time of the workday. Oswalt, who had no knowledge that the intermediate valve had been removed, opened the main valve. At that time, ammonia began leaking into the ceiling area of the cut floor room.

Sometime after 9:30 p.m., IBP employees informed maintenance supervisor Jones that there was an ammonia leak. At that point, Jones put on a canister mask and headed for the ham room area, but had to turn back because the ammonia was so concentrated. Jones then put on a self-contained breathing apparatus (SCBA) and went into the ham room and cut floor room on several occasions to see if all employees had evacuated. In the meantime, Grote went to the roof to close off the main ammonia valve.

IBP maintenance employee Ken Maddison testified that he put on a canister mask so that he could enter the cut floor room area to see how severe the leak was. As he walked toward the ham door, he could see the ammonia in the air and was forced to turn back because the filters on the mask began to leak. Maddison described the ammonia as a heavy fog and testified that his eyes burned slightly.

---

**3.** The IOSHA citations explain that employees were "pulling out the guts" or removing the body insides of a regulator valve on a three-inch refrigeration coolant line over the cut floor to increase refrigerant flow.

Maddison then went back to the supply room to inform Jones of the severity of the ammonia leak.

At approximately 10:05 or 10:08 p.m., an evacuation signal sounded at the IBP facility.

Complaints of a strong odor, possibly ammonia, were reported to the 911 center in Council Bluffs at 10:25 and 10:31 p.m. These reports were made by businesses located approximately one-half mile away from the IBP plant. Fire trucks were dispatched to these locations, but it was eventually learned that the ammonia leak was at the IBP facility.

At approximately 10:28 p.m., Maddison was opening doors to air out the plant when he looked inside and saw a person's leg on the floor between two pieces of equipment. Maddison testified he tried to enter the cut floor room more than once without wearing a mask, but was forced to turn back because the ammonia was too strong. Maddison then ran from the cut floor area to the supply room to find someone with a gas mask or other breathing equipment who could go in and get the downed man. There were no self-contained breathing units in the supply area available to Maddison. Maddison saw ham boning supervisor Mark Didamo and maintenance employee Dave Gulick in the supply area and told them he had seen the down man. At that time, Gulick and Maddison went back to the cut floor area where Maddison had seen the down man. The down man was thought to be a worker performing cleaning services and employed by NSCI, a subcontractor, and not by IBP.

Sometime before 10:35 p.m., Didamo had also tried to enter the cut floor area wearing a self-contained breathing apparatus to look for the down man, but was forced to turn back due to the ammonia.

At 10:35 p.m., IBP security advised the 911 center of an ammonia leak. At about that same time Gulick, wearing a canister type mask, entered the cut floor area and pulled the missing NSCI employee from the plant. Maddison, who was not wearing any breathing equipment, entered the area halfway and helped Gulick pull the NSCI employee out of the plant. Maddison testified the ammonia had dissipated a bit so that it did not bother him as much and he was able to help Gulick pull out the NSCI employee. Gulick testified he had no problems when he entered the cut floor room wearing the canister mask. At 10:39 p.m. IBP contacted the 911 center and requested an ambulance.

The NSCI employee later died of exposure to ammonia. IBP employees Jones, Grote, Gulick, and Maddison, and three NSCI employees were also taken to the hospital. Of the IBP employees who entered the cut room floor area during the ammonia leak, Maddison was the only employee who sustained serious side effects. At the time of the case hearing, Maddison had received a job transfer from maintenance to supply, and had work restrictions requiring him to avoid chemical irritants, extreme temperatures, and noxious fumes.

Jones and Grote were later terminated by IBP for violating IBP's safety policy by working on a piece of equipment in an unsafe manner.

### D. Analysis.

■ 1. On appeal, the agency contends that the district court wrongfully concluded that IBP was exempt from the duty to develop an emergency response plan as required by 29 C.F.R. § 1910.120(q)(1). We agree with the agency's contention.

■ First, we believe that in order to satisfy the exemption language found in 29 C.F.R. § 1910.120(q)(1), an employer's plan must specifically call for evacuation only. In other words, an employer's plan cannot address both evacuation and rescue operations. Having clarified our understanding of the exemption provision in 29 C.F.R. § 1910.120(q)(1), we now examine IBP's disaster readiness plan.

IBP's disaster readiness plan states that in the event of a major ammonia leak, personnel shall evacuate the area immediately. Jeff Johnson, IBP's plant manager, testified that IBP's disaster readiness plan was communicated to maintenance employees by Darrel Jourdan, the maintenance training supervisor, both during orientation and in annual program reviews. Jourdan testified that he tells employees their responsibility is to evacuate the facility and not to rescue. Additionally, the four IBP employees (Jones, Didamo, Maddison, Gulick) who reentered the plant at various times after the evacuation signal sounded testified that no one specifically told them to attempt a rescue, but rather that they decided on their own to go back in to find the down person.

However, IBP's written disaster readiness plan also contains language stating that in the event of a major ammonia leak, the plant engineer or his designee shall organize a rescue and repair team. This language establishes authority for formation of a rescue team. Additionally, employee Gulick testified that he had received training during orientation that during evacuation procedures, maintenance employees are to meet in the north parking lot to divide into two-person teams for any operations going back into the plant. Gulick also testified that Jones started pointing out two-man teams upon learning of the ammonia leak, although the teams were never actually formed.

Based on these facts, we do not believe that IBP's disaster readiness plan only calls for evacuation of employees. The fact that IBP had not formed a specific rescue team nor trained its employees for rescue is not relevant. The important point is that IBP's written disaster readiness plan includes both evacuation and rescue procedures for purposes of responding to workplace emergencies. Thus, although IBP management expected its employees to evacuate the facility in the event of an emergency and not attempt rescue, IBP's disaster plan provided for rescue operations and was not strictly limited to evacuation.

Additionally, the evidence in the record suggests that the proper procedures to be followed in the event of an ammonia leak were not made clear to employees, including the supervisors who attempted rescue. For instance, employee Gulick testified that he inferred from reading the evacuation procedures during orientation that he was responsible for helping with any operations concerning an accident. Employee Didamo stated that because he had been trained in using self-contained breathing apparatus (SCBA), he believed he was to go in and find a down person. This evidence shows that some IBP employees believed they had certain duties to perform during an ammonia leak, rather than evacuate the facility, and thus it is not surprising that employees attempted rescue instead of evacuating the plant.

The evidence outlined above shows that IBP's disaster readiness plan calls for more than evacuation of employees. We therefore conclude that the agency's decision, that IBP was not exempt from the duty to have an emergency response plan in effect, *see* 29 C.F.R. § 1910.120(q), for purposes of responding to workplace disasters, is supported by substantial evidence.

■ 2. Because IBP failed in its duty of having a proper emergency response plan in effect, it therefore follows that IBP's disaster readiness plan did not satisfy the elements of an emergency response plan as required by 29 C.F.R. § 1910.120(q)(2) and as charged in Citation 1, Items 2–7f.

The district court erred in dismissing the 29 C.F.R. § 1910.120(q) violations. We reverse the district court's ruling on these issues and affirm the agency's decision concerning the violations charged in Citation 1, Items 1–7f.

**V. Did an IDLH atmosphere exist? Citation 1, Items 8–12, and Citation 3, Item 1.**

**A. The applicable workplace safety standards—29 C.F.R. § 1910.134.**

In Citation 1, Items 8–12 and Citation 3, Item 1, IBP was charged with violation of

respiratory protection standards. IBP allegedly violated these standards when employees entered the cut floor area which had an atmosphere immediately dangerous to life and health (IDLH) without wearing the proper respiratory/breathing equipment as required by federal regulations. *See* 29 C.F.R. § 1910.134(a)(3).[4] IBP contends an IDLH atmosphere did not then exist.

An IDLH atmosphere is defined as follows:

> an atmosphere concentration of any toxic, corrosive or asphyxiant substance that poses an immediate threat to life or would cause irreversible or delayed adverse health effects or would interfere with an individual's ability to escape from a dangerous atmosphere.

29 C.F.R. § 1910.120(a)(3). Thus, the determinative issue concerning this alleged violation is whether an IDLH atmosphere existed when IBP employees entered the cut floor room to rescue the down NSCI employee.

The level of ammonia in the atmosphere is determined by measuring the parts per million (PPM) of ammonia in the air. We find nothing in the federal regulations that specify when an IDLH atmosphere exists based on the amount of ammonia measured in parts per million. IBP's written disaster readiness plan, however, states that a reading of 500 PPM is an IDLH atmosphere. IBP maintains a respiratory protection program and requires preliminary plans for evacuation when ammonia readings reach twenty PPM. Evacuation of the work force is required when readings exceed thirty-five PPM.

## B. Analysis.

■ The agency contends that the district court wrongfully concluded that an IDLH atmosphere did not exist at the time IBP employees entered the plant to find the down man. The agency argues that scientific evidence of parts per million of ammonia in the atmosphere is not required because circumstantial evidence in the record shows that an IDLH atmosphere existed at the time IBP employees entered the plant.

Upon our review, we conclude that the agency's finding, that an IDLH atmosphere existed at the time the IBP employees entered the cut floor area to find the down NSCI employee, is supported by substantial evidence. The evidence shows that at some time before 10:05 p.m. (before the evacuation signal sounded), employees Jones and Maddison tried to enter the plant wearing canister masks, but had to turn back because the ammonia was too concentrated and because the filters on the mask began to leak. According to IBP's respirator program, a canister mask can only be used in ammonia levels of less than 500 PPM. Thus, the fact that a canister mask was not sufficient to allow Jones or Maddison to enter the plant suggests that the ammonia levels were at least 500 PPM, the level which IBP considers to be an IDLH atmosphere.

At some point before 10:35 p.m., the ammonia was still so strong that ham boning supervisor Didamo could not enter the cut floor area wearing a self-contained breathing apparatus. Additionally, in his statements to an IOSHA investigator, Jones stated that at one point he had reached the ham boning room and became disoriented and lost because the ammonia was so concentrated and he could not see. Maddison also described the ammonia as a heavy fog.

Based on this evidence, we believe that the level of ammonia in the atmosphere of

---

4. 29 C.F.R. § 1910.134(a)(3) states:

> The employee shall use the provided respiratory protection in accordance with instructions and training received.

29 C.F.R. § 1910.134(e)(3)(ii) provides:

> (e) *Use of respirators.* . . . (ii) When self-contained breathing apparatus or hose masks with blowers are used in atmospheres immediately dangerous to life or health, standby men must be present with suitable rescue equipment.

the plant was so high that it posed an immediate threat to life or could cause irreversible or delayed adverse health effects that would interfere with the employees' ability to leave the area. *See* 29 C.F.R. § 1910.120(a)(3). The fact that a scientific reading of the ammonia levels in the atmosphere was not available is not determinative of this issue. This is because the definition of an IDLH atmosphere does not mention a measurement of ammonia in parts per million.

We thus conclude that the agency's decision that an IDLH atmosphere existed at the time IBP employees entered the plant to rescue the missing NSCI employee is supported by substantial evidence. Accordingly, we reverse the judgment of the district court and affirm the agency's decision concerning the violations charged in Citation 1, Items 8–12, and Citation 3, Item 1.

## VI. Violation of energy control standards–lockout/tagout procedures,Citation 2, Items 2–7b.

### A. The applicable workplace safety standards—29 C.F.R. § 1910.147.

29 C.F.R. § 1910.147 imposes a duty on an employer to develop certain procedures to control hazardous energy which require that industrial machines or equipment be shut down and disconnected from their power source for the duration of servicing or repair operations. *See Reich v. General Motors Corp.*, 89 F.3d 313, 314 (6th Cir.1996). 29 C.F.R. § 1910.147(c) states in pertinent part:

> (c) *General*—(1) *Energy control program.* The employer shall establish a program consisting of energy control procedures, employee training and periodic inspections to ensure that before any employee performs any servicing or maintenance on a machine or equipment where the unexpected energizing, start

up or release of stored energy could occur and cause injury, the machine or equipment shall be isolated from the energy source, and rendered inoperative.

> . . . .

> (4) *Energy control procedure.* (i) Procedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section.

The standards found in 29 C.F.R. § 1910.147 "essentially require[ ] an employer to affix a 'lock' to an energy isolating device connected to the equipment ('lockout'), or, if the employer can prove its equal efficacy (or the equipment is unlockable), to place a 'tag' on the energy isolating device, warning employees not to operate the device or the equipment until the tag is removed ('tagout')." *International Union, UAW, v. Occupational Safety & Health Admin.*, 37 F.3d 665, 667 (D.C.Cir. 1994).

### B. Energy control procedures did not clearly and specifically outline rules and techniques to be utilized for the control of hazardous energy, 29 C.F.R. § 1910.147(c)(4)(ii)(B)—Citation 2, Item 2.

#### 1. The charged violation.

Citation 2, Item 2 charged that IBP's energy control procedures did not clearly and specifically outline the rules and techniques to be utilized for the control of hazardous energy in violation of 29 C.F.R. § 1910.147(c)(4)(ii)(B).[5] In other words, IBP was charged with failure to have specific procedures in effect to govern the removal of the intermediate ammonia line valve as required by 29 C.F.R. § 1910.147(c)(4)(ii)(B), which provides in pertinent part:

IBP concedes that violation.

---

5. We do not discuss the merits of the violations charged in Citation 2, Item 1 because

(ii) The procedures shall clearly and specifically outline the scope, purpose, authorization, rules, and techniques to be utilized for the control of hazardous energy, and the means to enforce compliance including, but not limited to, the following:

. . . .

(B) Specific procedural steps for shutting down, isolating, blocking and securing machines or equipment to control hazardous energy.

This alleged violation was based on the fact that valves supplying ammonia to the cooling system at the IBP plant were closed upstream and downstream, but that the affected area where the valve was removed was not isolated by use of lockout/tagout devices.

### 2. Analysis.

■ To emphasize the point, the issue concerning this charged violation is whether IBP had specific lockout/tagout procedures concerning removal of the ammonia line valve that was the source of the ammonia leak. The district court concluded that IBP maintains a lockout/tagout procedure which covers the ammonia line valve that was removed on the day of the ammonia leak and therefore dismissed the citations against IBP concerning lockout/tagout procedures in Citation 2, Item 2. The agency contends this was error.

Upon our review, we agree with the district court's decision. IBP plant engineer Jeff Johnson testified during the hearing before the ALJ about IBP Exhibit 22. Johnson identified Exhibit 22 as a set of written procedures pertaining to lockout/tagout procedures for the cut floor main liquid solenoid valve which IBP employee Grote pulled from the cut floor liquid ammonia line on June 30, 1993, and which was the source of the ammonia leak.

The district court made reference to Exhibit 22 in its decision. We believe that this evidence shows that IBP had a lockout/tagout procedure in place concerning the ammonia line valve that was removed on the day of the ammonia leak and that IBP has complied with 29 C.F.R. § 1910.147(c)(4)(ii)(B) concerning the requirements that an employer have specific energy control procedures in effect. Accordingly, the agency's finding that IBP failed to have proper lockout/tagout procedures in place covering the ammonia line valve that was removed on the day of the ammonia leak is not supported by substantial evidence.

We therefore affirm the judgment of the district court dismissing the violations charged in Citation 2, Item 2 against IBP.

### C. Failure to have periodic inspection of energy control procedures, 29 C.F.R. § 1910.147(c)(6)(i)—Citation 2, Item 3.

### 1. The charged violation.

Citation 2, Item 3 charged IBP with failure to comply with periodic inspections of energy control devices as required by 29 C.F.R. § 1910.147(c)(6)(i), which provides:

The employer shall conduct a periodic inspection of the energy control procedure at least annually to ensure that the procedure and the requirements of this standard are being followed.

Compliance with this standard requires the employer to certify that the periodic inspection was performed.[6]

### 2. Analysis.

■ The United States labor secretary has the burden of proving a federal workplace safety violation. *See Pennsylvania Power & Light Co. v. Occupational Safety & Health Review Comm'n,* 737 F.2d 350,

---

**6.** 29 C.F.R. § 1910.147(c)(6)(ii) explains the certification requirement as follows:

The employer shall certify that the periodic inspections have been performed. The certification shall identify the machine or equipment on which the energy control procedure was being utilized, the date of the inspection, the employees included in the inspection, and the person performing the inspection.

357 (3d Cir.1984) (secretary of labor bears burden of proof concerning every element of alleged violation by employer of occupational safety and health standards); *accord New York State Elec. & Gas Corp.*, 88 F.3d at 105. By analogy, it would therefore seem that the Iowa labor commissioner has the burden of proving that IBP failed to conduct periodic inspections as charged in Citation 2, Item 3. Thus, it would seem that the Commissioner would bear the initial burden of going forward with evidence that IBP did not comply with the inspection requirements. Once this occurs, the burden would then shift to IBP to show that it did conduct such inspections.

Upon our review, we conclude that the district court properly dismissed the charges against IBP concerning inspection requirements. The following excerpt from the administrative record shows that the IOSHA investigator did not ask IBP about documents concerning its compliance with the inspection requirements at issue:

Q. [Attorney for agency/IOSHA] Mr. Slater [IOSHA investigator], did you ask specifically Mr. Everidge [former IBP safety coordinator] about obtaining documentation on a periodic inspection of the energy control procedure for Citation 2, Item 3? A. I don't believe I did.

Q. Did you, at the closing conference, did you indicate that this particular section of the standard would be one that may be cited to the employer? A. All citations that were being proposed at that time were covered and given to the employer during closing conference.

Q. What did that, if you recall, did you ask, Mr. Everidge at the closing conference about this particular item that would be cited? A. Again, I think it's, was on a broader scope if I can testify to this. We ask for any supporting evidence to any of the citations that would document evidence that would show other than information that we had at the time. I guess that's not very clear how I'm trying to say it. But we told them that any information that they could provide to us on any of the citations, we would take back to Des Moines and consider amending the citations appropriately if those showed that they were in compliance with the standard.

Q. And did you receive any information from the company prior to issuing this particular violation that was directly related to documenting a [periodic] inspection of this energy control procedure for this item? A. No, we didn't.

There is no other evidence in the record concerning whether IBP complied with the inspection requirements. Without any such evidence, the burden never shifted to IBP to introduce evidence that it conducted the required inspections. The commissioner did not sustain his burden and it therefore follows that the agency's finding, that IBP failed to comply with the inspection requirements of 29 C.F.R. § 1910.147(c)(6)(i), is not supported by substantial evidence. We therefore affirm the decision of the district court to dismiss the alleged violations charged in Citation 2, Item 3.

### D. Failure to utilize lockout procedures—29 C.F.R. § 1910.147(d)—Citation 2, Items 5a–5f.

#### 1. The charged violations.

Citation 2, Items 5a–5f charged IBP with violations of 29 C.F.R. § 1910.147(d)(1) through (6), which establish certain requirements and procedures concerning: (1) preparations for, and the shutting down of machinery or equipment, (2) isolation of machinery or equipment from energy sources, (3) the use of lockout/tagout devices, and (4) proper methods to follow for affixing lockout or tagout devices by authorized employees. The language of 29 C.F.R. § 1910.147(d)(1) specifically states that an authorized or affected employee shall have knowledge of the energy, the hazards of the energy to be controlled and the method or means to control the energy before turning off a machine or equipment. The provisions of 29 C.F.R.

§ 1910.147(d)(1) through (6) not only require that an employer have lockout/tagout procedures in place, but also require that employees follow the procedures outlined.

## 2. Analysis.

■ The agency contends on appeal that the district court wrongfully concluded that IBP was being cited for failure to utilize energy control procedures, which was not charged as a violation, rather than for failure to have proper lockout/tagout procedures in place.

We concluded above that IBP had established lockout/tagout procedures in place covering removal of the ammonia line valve that was the source of the ammonia leak on June 30, 1993. This finding was based on the existence of IBP Exhibit 22 which is a set of written procedures pertaining to lockout/tagout procedures for removal of the main liquid solenoid valve above the cut room floor.

However, the violations charged in Citation 2, Items 5a–5f relate to IBP's alleged failure to follow or implement the required procedures for removal of the ammonia line valve. This is a different question from whether IBP had specific procedures in place governing the removal of the ammonia line valve which we discussed above as the violation charged in Citation 2, Item 2.

We note that even though Exhibit 22 shows that IBP had a specific lockout/tagout procedure governing removal of the ammonia valve, there is no dispute that neither Grote nor Jones applied any lockout/tagout procedures as discussed in Exhibit 22. Thus, IBP employees simply failed to follow the established procedures concerning application of lockout/tagout devices.

We therefore conclude there is substantial evidence to support the agency's finding that IBP did not comply with its lockout/tagout procedures as required by 29 C.F.R. § 1910.147(d)(1) through (6). Accordingly, we reverse the decision of the district court and affirm the agency's decision concerning the violations charged in Citation 2, Items 5a–5f.

## E. Violation of group lockout/tagout procedures, 29 C.F.R. § 1910.147(f)(3)(i), (ii)—Citation 2, Items 7a–7b.

### 1. The charged violations.

Citation 2, Items 7a–7b charged IBP with failure to utilize necessary protective procedures when servicing the valve, such as group lockout or tagout procedures, in violation of 29 C.F.R. § 1910.147(f)(3)(i), (ii). 29 C.F.R. § 1910.147(f)(3)(i) provides:

> When servicing and/or maintenance is performed by a crew, craft, department or other group, they shall utilize a procedure which affords the employees a level of protection equivalent to that provided by the implementation of a personal lockout or tagout device.

### 2. Analysis.

■ The issue concerning this violation focuses on whether the removal and repair of the ammonia valve was being performed by a group or crew, or by Grote alone. There appears to be no definition of what constitutes a group for purposes of this standard.

Upon our review, we disagree with the district court's conclusion that the work on the ammonia line valve was not performed by a group. The record shows that Jones had discussed with Jourdan, the maintenance superintendent, before he left the facility, a problem with the ammonia system. Jones and Grote then decided together that the valve should be removed, although Jones instructed Grote to perform the actual work of removing the valve.

These facts show that removal of the valve involved more than one person. We do not believe that the fact that the physical act of removing the valve was performed by one person is determinative of this issue. This is because, in most in-

stances, such work on a line near the ceiling over the cut floor might likely be performed by one person. Additionally, Grote would not have removed the valve on his own as he likely did not have authority—as a supervisor would—to make such decisions. Thus, the important point is that the troubleshooting of the valve and the decision to remove it were made as part of a joint effort.

We therefore conclude that the agency's decision that IBP employees failed to comply with group lockout/tagout procedures is supported by substantial evidence. Accordingly, we reverse the judgment of the district court and affirm the agency's decision concerning the violations charged in Citation 2, Items 7a–7b.

### F. Willful violation, Citation 2, Item 4—failure to notify affected employees of application of lockout/tagout devices, 29 C.F.R. § 1910.147(c)(9).

#### 1. The charged violation and applicable law.

In Citation 2, Item 4, IBP was also cited for a willful violation of 29 C.F.R. § 1910.147(c)(9), which provides:

> *Notification of employees.* Affected employees shall be notified by the employer or authorized employee of the application and removal of lockout devices or tagout devices. Notification shall be given before the controls are applied, and after they are removed from the machine or equipment.

An "affected employee" is defined as follows:

> An employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under lockout or tagout, or whose job requires him/her to work in an area in which such servicing or maintenance is being performed.

29 C.F.R. § 1910.147(b).

▆▆▆▆ A willful violation of a workplace safety standard exists when the vi-

olation is committed with intentional disregard of, or plain indifference to, the requirements of the regulation. *Caterpillar, Inc. v. Herman,* 154 F.3d 400, 402 (7th Cir.1998). Thus, something more than just negligence on the part of the employer is required to support a finding of a willful violation of a workplace safety violation. *See McLaughlin v. Union Oil Co. of California,* 869 F.2d 1039, 1047 (7th Cir.1989) (a negligent violation of Occupational Safety and Health Act is merely "serious"). The distinction between a serious and willful violation of a workplace safety standard is similar to that in tort law between recklessness and negligence. *Caterpillar,* 154 F.3d at 402.

#### 2. Analysis.

▆▆▆▆ On appeal, the agency contends that the district court wrongfully concluded that IBP had no duty under 29 C.F.R. § 1910.147(c)(9) to notify outside employees (i.e., non-IBP employees) that work was being performed on the ammonia line valve.

Upon our review, we agree with the agency's contention. We first note that the definition of an "affected employee" in 29 C.F.R. § 1910.147(b) does not distinguish between IBP employees and a subcontractor's employees. We therefore believe that the term "affected employee" includes any employee who is working in an area where servicing or maintenance of equipment is being performed. Under this interpretation, IBP would have a duty to notify any employees working in a particular area, including both IBP and subcontractor's employees, that work was being performed on equipment in that area.

In this case, the item being worked on was the ammonia line valve near the ceiling of the cut floor room. Thus, IBP had a duty to notify anyone working in the cut floor area, whether employees of IBP or of a subcontractor, that work was being performed on the ammonia line valve and that the valve had been removed. We believe

that IBP's failure to give such notice amounts to more than just lack of diligence. IBP simply made no effort to comply with the notification standards. We believe the following statements by the ALJ illustrate the point:

The actions of IBP supervisory people at this time show a disregard for the safety of individuals.... There is an indifference present for the safety of employees. The supervisory employees knew or should have known of the dangers associated with ammonia gas and taken appropriate action to assure that affected employees knew what was going on. Notification is an essential first step and this step may have avoided the major ammonia leak situation because of the added failure to lockout/tagout [the valve].

We therefore reverse the decision of the district court and affirm the agency's decision concerning the willful violation charged in Citation 2, Item 4.

### G. Willful violation—Citation 2, Item 6.

**1. The charged violation—IBP did not inform outside employer of its lockout/tagout procedures, 29 C.F.R. § 1910.147(f)(2)(i).**

Citation 2, Item 6 charged that IBP did not inform employees of NSCI, the subcontractor, of IBP's lockout procedures for affected employees working in the cut floor area that work was being performed on the ammonia refrigerant line, all in violation of 29 C.F.R. § 1910.147(f)(2)(i). 29 C.F.R. § 1910.147(f)(2)(i) provides:

*Outside personnel (contractors, etc.).* (i) Whenever *outside servicing personnel are to be engaged in activities covered by the scope and application of this standard,* the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures.

(Emphasis added.)

This violation is apparently based on the allegation that IBP and NSCI did not in-

form each other of their respective lockout/tagout procedures and that IBP maintenance employees did not inform NSCI employees working in the cut floor area that work was being performed on the ammonia line valve.

### 2. Analysis.

■ The administrative record shows that an NSCI official signed an agreement on December 13, 1991, (identified in the record as IBP's exhibit 18) stating that it had reviewed with an IBP plant engineer the IBP lockout/tagout policy and agreeing to use IBP's lockout/tagout policy on all work to be performed on IBP premises and equipment. The district court concluded that IBP had complied with the requirements of 29 C.F.R. § 1910.147(f)(2)(i) based on its written agreement with NSCI and that NSCI agreed to be bound by IBP's mechanical lockout/tagout policy.

On appeal, the agency seems to contend that simply having a written agreement that outside contractors would be bound by IBP's lockout/tagout procedures did not relieve IBP of its duty to notify outside employers when lockout/tagout procedures would be utilized.

Upon our review, we conclude that IBP did not commit a violation of the standard found in 29 C.F.R. § 1910.147(f)(2)(i), but we do so for reasons different from those given by the district court. A careful reading of the language of 29 C.F.R. § 1910.147(f)(2)(i) suggests that an on-site employer and outside employer are only required to inform each other of their respective lockout/tagout procedures "whenever *outside servicing personnel* are to be engaged in activities covered by" the lockout/tagout standards. Based on this language, it would seem that the duty concerning notification of lockout/tagout procedures is only triggered when *outside servicing personnel* will be utilizing lockout/tagout devices.

In this case, however, it was IBP employees, and not outside employees, who removed the main ammonia line valve and thus it was IBP employees who should have utilized IBP's lockout/tagout procedures. Thus, any duty IBP had to notify NSCI of its lockout/tagout procedures was never triggered here because no NSCI employees worked on the ammonia line valve. Rather, the NSCI employees at the plant at the time of the ammonia leak were performing cleaning services on the cut floor.

Accordingly, the agency's decision that IBP failed to inform NSCI, the outside employer, of its lockout/tagout procedures is not supported by substantial evidence. We therefore affirm the judgment of the district court as to the violation charged in Citation 2, Item 6.

## VII. Did IBP have sufficient knowledge of the alleged violations?

The agency also contends on appeal that the district court wrongfully dismissed certain citations against IBP based on the court's conclusion that IBP did not have the requisite knowledge of the alleged violative conditions.

### A. Serious violations-background law.

Iowa Code section 88.14(11) states in pertinent part:

> ... a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless *the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.*

(Emphasis added.)

■ To support a finding of a serious violation of the special duty clause, *see* 29 U.S.C. § 654(a)(2), four elements must be shown: (1) a relevant safety standard applies; (2) the employer failed to comply with it; (3) employees had access to the violative condition, and (4) the employer had knowledge or constructive knowledge of the violative condition. *New York State Elec. & Gas Corp.*, 88 F.3d at 105; *see also Carlisle Equip. v. Secretary of Labor*, 24 F.3d 790, 792 (6th Cir.1994).

■ The knowledge element may be satisfied by proof that the employer had either actual or constructive knowledge of a violative condition. *New York State Elec. & Gas Corp.*, 88 F.3d at 105. Constructive knowledge may be shown by proving that the employer, "with the exercise of reasonable diligence, could have known of the presence of the violative condition," *id.* (quotations and citations omitted); *see also Carlisle Equip.*, 24 F.3d at 793, or by the employer's failure to establish an adequate program to promote compliance with safety standards. *New York State Elec. & Gas Corp.*, 88 F.3d at 105–06; *Brock v. L.E. Myers Co.*, 818 F.2d.1270, 1277 (6th Cir.1987) ("Secretary [of Labor] makes out a prima facie case of the employer's awareness of a potentially preventable hazard upon the introduction of proof of the employer's failure to provide adequate safety equipment or to properly instruct its employees on necessary safety precautions.") Knowledge of a safety violation, either actual or constructive, may also be imputed to an employer through a supervisory agent. *New York State Elec. & Gas Corp.*, 88 F.3d at 105.

### B. The serious violations—Citation 1, Items 1–12, Citation 2, Items 5a–5e, Citation 3, Item 1.

Upon our review, we conclude that the agency's decision that IBP had the requisite knowledge of the violations charged in Citation 1, Items 1–12, Citation 2, Items 5a–5e, and in Citation 3, Item 1, is supported by substantial evidence.

■ As noted above, IBP's disaster plan addressed both evacuation and rescue procedures. IBP was, therefore, not exempt from the duty to have an emergency response plan in effect, but rather should have had a disaster plan in place that satisfied the requirements of an emergency response plan and adequately communicated that plan to employees. IBP therefore did not have an adequate safety program in place to promote compliance with workplace safety standards. We conclude that IBP's failure to establish an adequate disaster response plan constitutes constructive knowledge on its part of the violations charged in Citation 1, Items 1–7 concerning emergency response standards. *See New York State Elec. & Gas Corp.*, 88 F.3d at 105–06 ("constructive knowledge may be predicated on an employer's failure to establish an adequate program to promote compliance with safety standards"); *Danco Const. Co. v. Occupational Safety & Health Review Comm'n*, 586 F.2d 1243, 1247 (8th Cir. 1978) (employer "cannot fail to properly train and supervise its employees and then hide behind its lack of knowledge concerning their dangerous working practices"); *Brennan v. Occupational Safety & Health Review Comm'n*, 511 F.2d 1139, 1143 n. 5 (9th Cir.1975) ("Proof of an employer's *failure to provide* guardrails, safety equipment, instructions, or the like, would establish a prima facie case of an employer's knowledge of its own acts of omission.").

■ Additionally, because IBP should have known that employees did not have a clear understanding of their duties during an emergency, IBP likewise should have known that it was possible certain employees might attempt to engage in rescue operations rather than evacuate the plant. IBP therefore should have had appropriate breathing equipment available to undertake rescue operations which were not available during the ammonia leak. Moreover, Jones, as supervisor and the IBP official in charge of the plant at the time of the ammonia leak, should have known that employees could not enter the ammonia leak area without the appropriate personal protective and breathing equipment. Jones' knowledge of these violations can be imputed to IBP. *See New York State Elec. & Gas Corp.*, 88 F.3d at 105.

■ We also note that Jones, acting in his capacity as a supervisor, instructed Grote to remove the ammonia line valve, but did not instruct Grote concerning lockout/tagout procedures and did not check to see whether Grote complied with these procedures. We believe that Jones could have known, in the exercise of reasonable diligence, that Grote had not complied with the lockout/tagout procedures and that this knowledge can be imputed to IBP. *See id.* (knowledge may be satisfied by proof that employer, with the exercise of reasonable diligence, could have known of the presence of the violative condition). IBP therefore had constructive knowledge of violations concerning lockout/tagout procedures.

We thus conclude that IBP at least had constructive knowledge of the violations charged in Citation 1, Items 1–7 (emergency response standards) and Items 8–12 (respiratory protection standards), in Citation 2, Items 5a–5e (lockout/tagout procedures), and in Citation 3, Item 1 (respiratory protection standards).

We therefore reverse the decision of the district court and affirm the agency's decision concerning whether IBP had the requisite knowledge of the above mentioned violations charged in this case.

**C. Knowledge of willful violations— Citation 2, Item 4.**

The agency also contends that the district court erred in dismissing the willful violation charged in Citation 2, Item 4, alleging that IBP failed to notify affected employees that work was being performed on the ammonia line valve.

As noted above, a willful violation of a workplace safety standard is an intentional

or knowing, voluntary disregard for the requirements of the safety regulation. *Caterpillar,* 154 F.3d at 402. We concluded above that the agency's decision that IBP committed a willful violation of 29 C.F.R. § 1910.147(c)(9) by failing to notify affected employees was supported by substantial evidence. We believe it therefore follows that IBP had the requisite knowledge of the violation charged in Citation 2, Item 4.

We reverse the decision of the district court and affirm the agency on this issue.

## VIII. Isolated incident defense.

The agency also contends on appeal that the district court wrongfully concluded that IBP had established the isolated incident defense to the .violations charged in Citation 1, Items 1–12 (emergency response and respiratory protection standards), and in Citation 2, Items 4 (willful violation-failure to notify affected employees work was being performed on ammonia line valve) and 5 (failure to utilize lockout/tagout procedures). IBP seeks to uphold the district court ruling.

### A. General background law.

Once the labor commissioner has proven a prima facie case of a violation of a workplace safety standard, the employer may defend the violation on the basis that the actions giving rise to the alleged violation were an isolated incident/occurrence or unpreventable employee misconduct. *Brock,* 818 F.2d at 1276; *see also P. Gioioso & Sons, Inc.,* 115 F.3d at 109; *Danco Constr. Co.,* 586 F.2d at 1247 n. 6. To prevail on an isolated incident defense, the "employer must demonstrate that it (1) established a work rule to prevent the reckless behavior and/or unsafe condition from occurring, (2) adequately communicated the rule to its employees, (3) took steps to discover incidents of noncompliance, and (4) effectively enforced the rule whenever employees transgressed it." *P. Gioioso & Sons, Inc.,* 115 F.3d at 109; *see also New York State Elec. & Gas*

*Corp.,* 88 F.3d at 106; *Austin Bldg. Co. v. Occupational Safety & Health Review Comm'n,* 647 F.2d 1063, 1069 (10th Cir. 1981) (failure of employer's safety program to effectively communicate the need for guarding against risks associated with welding on platform without guardrail or safety belt provided a substantial basis for rejecting isolated occurrence defense).

### B. Application of the law.

Without unduly lengthening this opinion by additional factual recitations from the record, we conclude that there is substantial evidence in the record to support the agency's decision that IBP failed to establish the isolated incident defense as to the violations charged in Citation 1, Items 1–12, and in Citation 2, Items 4, and 5.

We therefore reverse the district court and affirm the agency's decision on this issue.

### IX. Disposition.

We conclude that there is substantial evidence to support the agency's decision that IBP committed a violation of workplace safety rules as charged in Citation 1, Items 1–7 concerning emergency response standards, *see* 29 C.F.R. § 1910.120(q)(1), and as charged in Citation 1, Items 8–12 and Citation 3, Item 1 concerning respiratory protection standards, *see* 29 C.F.R. § 1910.134. We affirm the agency and reverse the district court on those issues.

We do not address the merits of the violation charged in Citation 2, Item 1, because IBP concedes that violation.

We conclude that there is substantial evidence to support the agency's finding that IBP committed a violation of workplace safety rules as charged in Citation 2, Items 5a–5f, 7a–7b concerning energy control/lockout/tagout procedures, *see* 29 C.F.R. § 1910.147, and as charged in Citation 2, Item 4 concerning a willful violation of standards requiring an employer to notify affected employees of work being done on the ammonia line valve, *see* 29 C.F.R. § 1910.147(c)(9). We affirm the agency

and reverse the district court on those issues.

We affirm the district court's decision and dismissal of charges relating to the violations charged in Citation 2, Item 2 concerning whether IBP had specific lockout/tagout procedures to cover the work done on the ammonia line valve, *see* 29 C.F.R. § 1910.147(c)(4)(ii)(B), Citation 2, Item 3 concerning periodic inspection requirements, *see* 29 C.F.R. § 1910.147(c)(6)(ii), and the court's decision relating to the willful violation charged in Citation 2, Item 6 concerning failure to notify outside employers of lockout/tagout procedures, *see* 29 C.F.R. § 1910.147(f)(2)(i).

We therefore affirm in part and reverse in part the decision of the district court and remand the case to the agency for calculation of applicable reduced penalties against IBP consistent with this opinion. Costs on appeal should be taxed five-sixths to IBP and one-sixth to the agency.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**